Argued March 19, decided April 1, 1913.

**MASON *v.* MELHASE.**\*

(130 Pac. 1134.)

**Evidence—Documentary Evidence — Authentication of Books Necessary.**

Books and the records of a sawmill company showing the number of feet in logs, made up from papers called scale cards, were properly rejected where the only witness who could testify as to accuracy of the scale sheets admitted that they were founded to a considerable extent on mere guesswork, and there

was no other· evidence as to the regularity of this documentary evidence; for, while books regularly kept may be admitted, the regular keeping must be established as a fact preliminary to their introduction.

\* As to what is provable by books of account, see note in 52 L. R. A. 689.                                                        Reporter.

From Klamath:  Henry L. Benson, Judge.

Statement by Mr. Justice Burnett.

As admitted in the pleadings, the parties to this action made the following agreement:

"This article of agreement, entered into by and between W. H. Mason, party of the first part, and Fred Melhase, party of the second part, witnesseth:  That the said party of the first part hereby agrees, for and in consideration of the sum of four and 50-100 dollars per thousand feet, to cut five million feet, more or less, of timber into saw logs,·furnished by the second party on parts of sections 10, 11, 14, 15, 22 and 23, township 35 S., R. 6 E., W. M., in Oregon.  The said first party shall deliver the logs so cut, in the water at the mouth of Crystal creek, at or near the upper end of Upper Klamath Lake, in Klamath County, Oregon.  It being understood and agreed that the said timber, being on government land, is to be indicated by the government forester in charge of said lands. The said first party also hereby agrees to pile all of the brush of the said timber to be cut, according to the requirements of the forest ranger in charge.  It is also understood and agreed by the parties hereto that the basis for calculation shall be what is known as the 'Scribner scale,' all logs to be measured by the said first party in the woods, by taking both large and small diameters of the small end of each log and then taking the average of the two diameters, which average shall be taken as the true diameter.  Also the scale is to be checked and verified at the mill.  It is also hereby agreed by the said party of the first part that after the first month's logging he will deliver at the mouth of said Crystal creek a minimum·of four hundred thousand feet each month.  The said second party hereby agrees to furnish the timber according to the foregoing, and to pay for the cutting and delivery of said logs at the mouth of

said Crystal creek, the sum of $4.50 per thousand. Said payments to be made from time to time on the delivery of each raft of said logs at said point. It is also understood and agreed that said second party shall accept each raft of 100,000 feet or more of said logs as soon as it shall be delivered at the mouth of said Crystal creek, and in case he shall fail to do so, he hereby agrees that the said first party shall not be liable for any damage which may accrue by reason of logs becoming scattered on account of there being no one at the point of delivery to receive them at the time of delivery of any one of said rafts. The said party of the first part hereby agrees to furnish a good and sufficient bond for the faithful performance of his part of this contract.

"Signed this 14th day of March, 1910.

"W. H. Mason, Party of the First Part.

"Fred Melhase, Party of the Second Part.

"Witness: H. J. Mattoon."

In his first cause of action the plaintiff claims that operating under this contract he cut 3,398,586 feet of the timber and delivered the same at the place specified in the contract, whereby the defendant became indebted to him in the sum of $15,293.61, of which he has paid $11,650, leaving a balance due to the plaintiff of $3,643.61. For a second cause of action the plaintiff alleges that, although he was actively engaged in the performance of the agreement according to its terms, the defendant rescinded the contract without cause September 10, 1910, and prevented the plaintiff from continuing the work, whereby he was damaged by a loss of profits in the sum of $1,600.

In the answer the contract is admitted, but the defendant denies that plaintiff cut or delivered more than 2,471,995 feet of logs, whereby he earned no greater sum than $11,123.98. The defendant, admitting that he paid the sum of $11,650, claims a recoupment of $526.02 from the plaintiff as an overpayment. As affecting the rule by which the proper measurement of logs should be determined, the amended answer alleges a custom about

deductions to be made from the full scale as an allowance for rotten, crooked, or hollow logs, and, in substance, avers that the correct amount of timber was stated in the answer, and was thus ascertained.

The answer was traversed by the reply. As the result of a jury trial and verdict a judgment was entered for plaintiff for the sum of $3,643.61, and the defendant appeals. AFFIRMED.

For appellant there was a brief over the names of *Mr. J. C. Rutenic* and *Messrs. Stone & Barrett,* with oral arguments by *Mr. Rutenic* and *Mr. C. F. Stone.*

For respondent there was a brief over the names of *Messrs. Kuykendall & Ferguson,* with an oral argument by *Mr. Delmon V. Kuykendall.*

MR. JUSTICE BURNETT delivered the opinion of the court.

At the argument but two questions out of the many reserved in the record were presented to the court for consideration. One was the office and effect of the custom in such cases as relied upon by the amended answer. The other was the admissibility of the ledger of the Long Lake Lumber Company, together with certain papers called scale cards, purporting to show the scale of the logs sawed by the lessee of the Long Lake Lumber Company at its mill.

On the first cause of action the ultimate material question in dispute was what was the amount of logs cut and delivered under the contract mentioned. It appears in evidence that the mill alluded to in the contract where the scale was to be checked and verified was the property of the Long Lake Lumber Company. One McGowan was at the time running the mill as lessee under contract to saw the logs into lumber at so much per thousand feet of the lumber. The defendant was interested in the mill company, and bought the logs from the government forest

reserve, transferring them to the lumber company at
exactly what it cost him to deliver them at the mill.   The
logs, having been floated from the place of delivery along
Upper Klamath lake, a distance of 20 miles or more, to
the mill, were there taken in charge by employees of
McGowan.   It was the duty of one of these men called the
"pondman" to haul the logs out of the pond and put them
upon the carriage to be sawed.   It was also his duty to
scale the logs as they were delivered upon the carriage.
During the period when the logs in question were sawed,
various men occupied the position of "pondman" under
the employment of McGowan.   In scaling the logs it was
their duty to put down on pieces of paper kept by them
the scale of each log, showing the number of feet, and
these papers were turned over to the Long Lake Lumber
Company each day as a rule, though some of them were·
delivered to McGowan, who, in turn, gave them to the
officers of the company.   W. O. Huson, the secretary of
the company, testified that these sheets came into his
possession, and he made up the ledger offered in evidence
from the data thus afforded.   He was absent from the
mill a considerable portion of the time while the logs were
being sawed, and had no immediate supervision of the
scaling, although he says he went to see about it casually
every day he was in town, and, if a new man was put
at the work, he saw to it that he knew how to scale.
Huson produced 83 pages of what he said were scale
sheets thus furnished to him.   They consist of numerous
columns of figures in pencil headed Mason logs, Vose
logs, Brown logs, and other names.   They are not signed
by any one, and no offer was made to prove the hand-
writing of the persons who made them.   None of the
scalers or pondmen were offered as witnesses, although
two of them at least were in the town of Klamath Falls
where the trial was held.   Huson testified that he did
not know the whereabouts of any of the others except

that he heard one was either in Alaska or Texas, but no showing of any diligence was made to procure the testimony of any of the men who actually did the scaling or made the sheets offered in evidence.

Some of the testimony from McGowan, the employer of the pondmen, is here quoted:

"Q. Mr. McGowan, in making this scale of the logs that were delivered at the mill under the contract between Mr. Mason and Mr. Melhase, were the logs scaled that were sawed?"

"A. Well, if they were not scaled, they were supposed to have been guessed at."

"Q. Supposed to have been guessed at? What do you mean by that?"

"A. Our man was supposed to scale all the logs, but he must keep the mill going, and, if it was a case of neglecting one, he neglected the log scale, but he was supposed to scale very liberal as to the amount of feet in any log."

"Q. What amount of logs would it probably be that he would not have time to scale? What class of logs, large or small?"

"A. Small. You see, sometimes when the carriage would get to him, they would be out of logs, and, as soon as the logs were hauled up, he would not have time to scale the logs, so he would roll one onto the carriage, and start sawing, and then he would judge the number of feet there was in that log, without putting the rule onto it."

"Q. Do you know whether they did that with reference to all the logs or not?"

"A. That was my instructions to do that. You see the Long Lake Lumber Company claimed our tally was overrunning the log scale pretty strong, and we were cutting mostly two-inch, and we figured on getting an overrun, so I did not want the men to judge a log under its footage. I would rather they judge it over, because, if they judge it under, it would look worse for me on the board measure tally, so they were instructed to be liberal as to the footage in the log; that is all."

"Q. Were those logs marked so they could be identified when they reached the pond?"

"A. I did not look into that. That was up to the man on the logging deck."

"Q. What position did that man hold in the work?"

"A. We called him 'pondman.' He was supposed to gather up the logs in the pond and bring them to the mill."

"Q. Was he working under your supervision?"

"A. Yes, sir?"

"Q. Was that work done by one man or various people?"

"A. During the season?"

"Q. Yes, sir."

"A. By various people."

By the Court: "He may state, if he knows, what they (the tally slips) are."

"A. You want me to state if I recognize these figures?"

By Mr. Stone: "Q. I want you to state, if you recognize those slips, what they are?"

"A. I recognize what they are meant for. The idea is this: That there are lots of these tallies I have never seen the logs scales. There would be some of these I would recognize. I don't recognize these figures here, although my man may have written down these figures, yet I don't know that."

"Q. Well, then, that scale that was made of those logs was made under your supervision, was it?"

"A. Well, my man, the man I had, was hired to bring those logs up into the mill, any logs, and he was also instructed to scale the logs, but, if he could not do both, then he had to keep the logs up there."

It was from these slips that Mr. Huson, the secretary of the lumber company, compiled the ledger offered in evidence.

Books regularly kept under certain circumstances may

be admitted in evidence, but the regularity of their keeping must be established as a fact, preliminary to their introduction, by competent evidence. This introductory step of determining the authenticity of the books is a question to be passed upon by the court. This is analogous to the principle by which the court is required to determine in the first instance whether a confession is voluntary or not, or whether a witness is of sufficient understand to be allowed to testify and the like. The testimony of Mr. Huson could not throw any light upon the regularity of the making of these scale sheets because he was not present when they were made, and had no knowledge of how they were kept except by hearsay. The testimony of McGowan clearly discloses their inaccuracy, and shows that they were founded to a considerable extent on mere guesswork. The court as a trier of preliminary fact concerning the authenticity of these scale sheets was amply justified in deciding against their reception in evidence. The ledger being confessedly a mere compilation of these scale sheets, so called, rests upon no better foundation than the sheets themselves, and was likewise properly rejected on the showing made. *Stidger* v. *McPhee,* 15 Colo. App. 252 (62 Pac. 332) ; *Trainor* v. *German American, etc., Ass'n,* 204 Ill. 616 (68 N. E. 650) ; *Miller* v. *Shay,* 145 Mass. 162 (13 N. E. 468: 1 Am. St. Rep. 449) ; *Swan* v. *Thurman,* 112 Mich. 416 (70 N. W. 1023) ; *Taylor-Woolfenden Co.* v. *Atkinson,* 127 Mich. 633 (87 N. W. 89). This evidence about the measurement of the logs being properly rejected, it is immaterial whether that process was conducted according to the custom pleaded or not so far as this case is concerned. It is unnecessary, therefore, to consider the question of custom.

Finding no error in the matter complained of, the judgment of the circuit court is affirmed.     AFFIRMED.