Argued at Pendleton May 2, reversed and remanded November 14, 1922.

## RADTKE *v.* TAYLOR.

(210 Pac. 863.)

**Witnesses—Party to Action may Testify.**

1. By Section 731, Or. L., a party to an action may testify without any more restrictions than are imposed on any other witness.

**Evidence—No Statute Regulates the Use of Shop-books as Evidence.**

2. In Oregon there is no statute that regulates the use of shop-books as evidence.

Evidence—Act Providing That Entries Made in Regular Course of Business are Originals Applies to Shop-books.

3. Section 791, Or. L., which provides that, when an entry is repeated in the regular course of business, one copied from another, at or near the time of the transaction, all entries are equally regarded as originals, is general in its scope, and applies to entries in shop-books as well as to other entries within its embrace.

Evidence—Entries of a Third Person in Regular Course of Business are Hearsay, and Inadmissible—Entries Against Interest of Decedent Admissible.

4. The general rule is that entries of a third person of transactions between such third person and others not parties to the litigation, or one of the parties litigant, are not admissible because they are hearsay and *res inter alios acta*, but, under one of the exceptions to the rule, entries against the interest of the person making them, the entrant being dead, are admissible.

Evidence—Act Making Admissible Entries of Deceased or Absent Persons Does not Affect Shop-book Rule.

5. Section 790, Or. L., providing that entries and writings of deceased or persons without the state made at or near the time of the transaction may be read as primary evidence in certain cases, does not affect the admission of evidence under shop-book rule which permits evidence of entries whether the entrant is dead or alive.

Evidence—Shop-book Rule Applies to Books of One Party to Show Sales to or Services Rendered the Other Party.

6. The shop-book rule applies to the books of one party to show sales made to or services rendered for the other party.

Alteration of Instruments—Evidence—Essentials for Laying Foundation for Admission of Shop-books Stated—Alterations Require Explanations.

7. As a foundation to the admission of a shop-book, evidence must show that the books appear to have been honestly kept; mutilation and alteration require explanation; they must be of original entry made in the course of business or employment; entries must be contemporaneous with transaction; a party may testify directly as to correctness thereof, and, if his own bookkeeper, he need not prove he had no clerk helping him.

Evidence—Entrant in Shop-book must be Called as Witness or Facts Shown Excusing Absence.

8. The entrant of shop-books, if available, must be called as a witness, or facts should be shown sufficient to excuse his absence, and the entrant must testify that the books were correctly kept.

Evidence—Shop-books Admissible by Proof of Entrant's Handwriting in Stated Cases.

9. If entries were made by a clerk who is dead, insane, or physically unable to attend as a witness, or permanently removed from the jurisdiction, shop-books may be made admissible by proof of his handwriting.

**Evidence — Personal Knowledge on Part of Entrant in Shop-books Essential.**

10. The entrant in shop-books must know of his own knowledge the truth of transactions he enters, and, if he made entries on reports of another who had personal knowledge, entrant should testify he made the entries in conformity with the report, which should be supplemented by testimony of the one reporting.

**Evidence—Evidence That Entrant had Knowledge of Transaction, and Made Entry Truthfully, is Some Evidence to Show Delivery of Goods.**

11. When entrant in shop-books testifies that at the time of making the entries he had knowledge of the transactions entered, and that he made the entries in accordance with the truth, there is not a total lack of evidence concerning the delivery of goods sued for.

**Evidence — To Make Shop-books Admissible, No Witness Need Testify as to Independent Knowledge of Delivery of Goods Sued for.**

12. It is not necessary, to make shop-books admissible, that some witness shall testify that he then recollects, independently of the books, that some of the articles were delivered.

**Evidence—Offerer of Shop-book Excused from Producing Entrant if Dead or Beyond Jurisdiction.**

13. If the entrant or person who makes the report for entry is unavailable because of death, insanity, physical disability or permanent absence from the jurisdiction, the offerer of a shop-book may be excused from producing him.

**Evidence—Offerer of Shop-books Excused from Producing Numerous Witnesses as to Entries Where Inconvenience Outweighs Utility.**

14. If practical inconvenience resulting from the production of numerous persons as witnesses to entries outweighs the probable utility of doing so, the offerer of shop-books may be excused from producing them.

**Evidence—Shop-books Admitted Though Other Testimony Exists.**

15. The existence of other testimony does not prevent the admission of books under the shop-book rule.

**Evidence—Trial—Court Passes on Admissibility of Shop-books, and Jury on Their Weight.**

16. The court passes on the admissibility of shop-books, and the jury on their weight.

**Evidence—Shop-books are Prima Facie Evidence of Pertinent Entries Therein.**

17. Shop-books, when received, are *prima facie* evidence of the pertinent entries therein contained, including delivery of the articles specified and the values thereof.

From Umatilla: T. E. J. DUFFY, Judge.

105 Or.—36

In Banc.

This is an action brought by F. B. Radtke against
Moses Taylor to recover $64.83, the alleged value of
goods, wares and merchandise claimed to have been
sold by the firm of Fix & Radtke and delivered on
and between October 4, 1916, and March 31, 1917, to
the defendant at his special instance and request.
The defendant answered by denying that he had pur-
chased any of the articles. A jury returned a ver-
dict in favor of the plaintiff for the amount de-
manded by him; and the defendant appealed from
the consequent judgment.

REVERSED AND REMANDED.

For appellant there was a brief over the name of
*Messrs. Peterson, Bishop & Clark,* with an oral argu-
ment by *Mr. Edward J. Clark.*

For respondent there was a brief over the names
of *Mr. Homer I. Watts* and *Mr. H. G. Prestbye,* with
an oral argument by *Mr. Watts.*

HARRIS, J.—The plaintiff has been engaged in
the general merchandise business in Athena since
about 1910. Prior to March, 1918, the store was
owned and conducted by Albert Fix and the plaintiff
as partners under the firm name of Fix & Radtke,
but upon that date the plaintiff acquired the inter-
est of his partner in the store as well as the outstand-
ing accounts, including the alleged account against
Taylor. The plaintiff has acted as manager of the
store during the time he has been "operating this
store," and one of his duties has been to collect the
accounts. The plaintiff testified that he kept the
books: "all this time," although he also stated:

"Since I took it over personally [in 1918] my wife sometimes helps me out." In other words, the plaintiff alone and without help kept the books until 1918 when he acquired the interest of his partner.

The defendant had been trading at the store prior to October, 1916,

"and running accounts there year after year for several years"; and "he had been coming in promptly each fall and paying off his bill in full."

The defendant had a housekeeper; but there is no evidence tending to show that any other person lived in his house or was a member of his household. According to the testimony of the plaintiff, "it was not customary for him [Taylor] to do the trading there," thus implying that the trading was done for Taylor by some other person or persons; but there is no evidence tending to indicate what other person or persons did the trading except some evidence indicating that the defendant's housekeeper may have done some trading prior to October, 1916.

Under date of October 13, 1916, the defendant gave to the partnership a check for $198.76 which, according to the defendant, paid the account to that date; but, according to the plaintiff, it paid the account to October 1, 1916. About a year after the delivery of this check the defendant received a statement from the partnership showing an indebtedness of $64.83 for goods claimed to have been purchased on and between October 4, 1916, and March 14, 1917. The defendant says that the next day after receiving the statement he went to the store and told the plaintiff that he had not purchased any of the items and was not indebted for them.

The defendant testified that when he delivered the check in payment of the account up to October 13,

1916, he told Radtke, "I was done with him," because of overcharges made for certain items; and the defendant also testified that he was never in the store after that date until he went there upon receiving the statement in 1917. The defendant says that he never authorized any person to buy goods at the store on his credit; and the housekeeper testified that she was never in the store after October 13, 1916, and that she never sent "anyone else to his store after that time for any goods." The plaintiff remembered about the defendant being in the store and signing a check, and recollected that the defendant called at the store in 1917 after receiving the statement; but he did not remember having seen Taylor in the store at any time between these two occurrences, although Taylor could have been in the store and the plaintiff not have seen him. When asked whether he remembered letting Taylor have any of the items in controversy, the plaintiff answered: "No, I can't remember that he got them personally, I can't swear to that." The plaintiff also stated that he had no recollection of Taylor himself getting any of the goods, "because it was not customary for him to do the trading there."

It is important to know the system of bookkeeping employed at the store. The items of each sale were entered on slips made at the time of the sale. At the end of each day these items were transferred to a loose leaf day-book, and at the end of each month the total amount of sales made to a given customer were entered in a ledger. The slips were not "any part of the books" as kept by Radtke, although the slips "were filed away for two years and after that destroyed." When the items were transferred from the slips, two sheets of paper and a carbon paper

were used, and thus the entries were made in dupli-
cate. The carbon duplicate was retained and became
a part of the day-book and the lead pencil or pen
and ink duplicate was sent to the customer. The
plaintiff testified that the lead pencil or pen and ink
duplicate sheets conaining the list of items in con-
troversy were sent to the defendant, but there is no
evidence giving any information as to when these
duplicates were sent to customers, or to Taylor if
any were sent to him. The day-book is the only book
in which may be found an itemized statement of the
account with any given customer, and there is no
other itemized record of such account at any time
except the slips which, as already explained, are de-
stroyed at the end of two years. This action was
commenced on May 13, 1920. The trial occurred on
October 15, 1921, or after the destruction of all the
sales slips. Six pages of the day-book purporting
to show the articles sold on and between October 4,
1916, and March 14, 1917, the value of the articles,
and the specific dates of such sales, were received in
evidence over the objection of the defendant.

The defendant contended at the trial and he still
contends that the sheets from the day-book were in-
competent, not the best evidence, and hearsay, and
that "no proper foundation has been laid for their
reception in evidence." If these sheets from the
day-book were improperly admitted, the judgment
must be reversed; because without the day-book
there is no evidence to sustain the judgment. The
defendant twice requested the court to direct a ver-
dict for him. One of these two requested instruc-
tions was based upon the ground that "there is no
proof of delivery of any of the goods included in the
alleged account of the defendant."

The record made by the defendant calls for a decision as to the foundation necessary to be laid for the reception of a shop-book; and it likewise becomes necessary to inquire into the nature and effect of shop-books considered as evidence. It should be remembered that there is no evidence that the books were correctly kept except such inferences as may be drawn from the defendant's testimony describing the system of bookkeeping which was employed, including an explanation that in transferring the items appearing on the slips "onto" the day-book, "they were taken one by one and entered under each man's account," and except the further circumstance, if it be evidence, that the defendant had in the fall of each year settled his previous annual accounts in reliance upon the books kept by the partnership. It is possible to infer from the record that the partnership had clerks; but if the firm did employ clerks the evidence fails to inform us about the number employed, or whether they were living at the time of the trial, or where they were, if living. The entries made by Radtke were transferred by him from the slips; and for aught that appears in the record, at the time of making the entries he may have had no knowledge whatever of any of the transactions except such knowledge as he acquired from an inspection of the sales slips. If the sales were made as alleged, all of them may have been made by Fix or by one or more clerks without any knowledge of any of the transactions on the part of Radtke except as he learned of them from the sales slips.

When considering the origin, development, essentials, scope and application of the shop-book rule we must at all times remember that this rule must not be confused with the rule which permits the use of

writings to refresh the memory, nor with the rule which permits the reception of a writing made by a third person or by a party and containing an admission against interest, nor with any rule which allows the use of a writing to corroborate or contradict the testimony of some witness, nor with that comprehensive rule of the common law which permits written entries made by deceased persons in the usual course of professional or official business, or in discharge of some duty: *Friendly* v. *Lee,* 20 Or. 202, 204 (25 Pac. 396); *Butler* v. *Cornwall Iron Co.,* 22 Conn. 334; 40 Law Bulletin, 215; 12 Bench and Bar, 14; *Ridgeley* v. *Johnson,* 11 Barb. (N. Y.) 527; 10 R. C. L., p. 1171, § 371; *Zang* v. *Wyant,* 25 Colo. 551 (56 Pac. 565, 71 Am. St. Rep. 145). Although some of these rules which are to be distinguished from the shopbook rule have some features which also belong to the latter, the shop-book rule possesses characteristics, historical or inherent, which serve at all times to differentiate it from the other rules.

It will be especially helpful to a correct understanding of modern application of the shop-book rule where a party has kept his own books if we examine into its history in England and the United States. As a preliminary it may be said that in courts where the civil law prevails a party's books of accounts have been received in evidence in connection with the oath of the party. Indeed, the use of shop-books as evidence is sanctioned by the courts of most of the countries of the civilized world: *Beach* v. *Mills,* 5 Conn. 494; 1 Pa. Law Journal, 105; *Rexford* v. *Comstock,* 3 N. Y. Supp. 876; *Conklin* v. *Stamler,* 17 How. Pr. (N. Y.) 399; *Larue* v. *Rowland,* 7 Barb. (N. Y.) 107; 2 Wig. on Evi., p. 1879; 1 Greenleaf on Evi., § 119.

Books of accounts were received in England more than three centuries ago. In 1609 a statute was passed limiting the use of shop-books. This statute recited a custom of receiving shop-books of "divers men of trade and handicraftsmen" in evidence of "the particulars and certainty of the wares delivered," whether the book had been kept by the party himself or by a clerk, and whether the entrant were living or dead; it declared that an evil had at times appeared in "leaving the same books uncrossed," if payment had been made; it asserted that the reception of such books involved the making of evidence for one's self; and it forbade such use of a party's shop-books "in an action for any money due for wares hereafter to be delivered or for work hereafter to be done," except within one year after the delivery of the wares or the doing of the work where a bill of debt existed between "merchant and merchant, merchant and tradesman, or between tradesman and tradesman," for matters within the trade: 2 Wig. on Evi., § 1518. The recital, appearing in this statute, concerning the custom of receiving shop-books might, standing alone and unexplained, suggest that at that time shop-books were of themselves evidence under the common law; but any such suggestion cannot be reconciled with Blackstone's statement:

"The penners of which [act of 1609] seem to have imagined that the books of themselves were evidence at common law." 3 Blackstone, 369.

The higher courts were averse to expanding beyond the limitations fixed by the statute the right to use shop-books as evidence; for they ultimately refused to allow the use of a party's shop-books at all after the expiration of a year after the delivery of the wares or the doing of the work. However, in in-

ferior courts where the jurisdiction was limited to small claims and where the rules of evidence were not strictly observed, it was the practice to use shop-books. Professor Wigmore is authority for the statement that—

"Apart from this local usage, the books of a party ceased after the 1600's to form the subject of a hearsay exception at common law in England. They came in again only under statutory rules of the late 1800's." 2 Wig. on Evi., § 1518.

The act of 1609 was the statute passed in 1863 "revivified and rendered perpetual." 4 Chamberlayne on Evi., § 3052; *Rexford* v. *Comstock,* 3 N. Y. Supp. 876. In this connection it is pertinent to remark that in courts of chancery shop-books were sometimes used by the chancellor "to inform his mind, although perhaps, not absolutely to govern his decision," for in *Kilbee* v. *Sneyd,* 2 Molloy, 186 (decided in 1828), it was said:

"On the trial of an issue the jury is confined to legal evidence, and evidence which is not legal cannot be admitted. But the Chancellor, although he performs the office of a jury in trying questions of fact arising from him (a), is not confined as a jury is to legal evidence, and for this reason, that credit is given to the Chancellor, that he will apportion its due effect and no more to such evidence, and, therefore, evidence that is not legal evidence may be used by him to inform his mind, although, perhaps, not absolutely to govern his decision. The distinction is, that it is entirely precluded at law." See also 1 Greenleaf on Evi. (15 ed.), p. 185, note (a).

It has been repeatedly asserted by courts and writers that the American doctrine which, independent of any statute, sanctioned the use of a party's books of accounts containing entries made by himself

is a creature of the courts and is not only not derived from the common law but it is in derogation of the common-law principle that a party shall not be permitted to make evidence for himself: *Larue* v. *Rowland,* 7 Barb. (N. Y.) 107; *Conklin* v. *Stamler,* 17 How. Pr. (N. Y.) 400; *Vosburgh* v. *Thayer,* 12 Johns. (N. Y.) 465; *Beach* v. *Mills,* 5 Conn. 494; *Sickles* v. *Mather,* 20 Wend. (N. Y.) 72 (32 Am. Dec. 521); *Forsee* v. *Matlock,* 7 Heisk. (Tenn.) 421; *Case* v. *Potter,* 8 Johns. (N. Y.) 212. The doctrine of the American courts is sometimes called the American common-law rule: Note in 52 L. R. A. 547; *Jackson* v. *Evans,* 8 Mich. 476. As one writer expresses it, when referring to the New York doctrine:

"The rule, as a rule of evidence, is really *sui generis,* as might be expected from its having been no part of the common-law system but having been borrowed from an entirely different system and engrafted thereon." 12 Bench and Bar, 16.

Under the rule of the common-law the books of a party, to be admissible, must have been kept by a clerk or other disinterested person; and if the entries were made by the party himself the books were inadmissible: 10 R. C. L. 1184; *Burr* v. *Byers,* 10 Ark. 398 (52 Am. Dec. 239); *Deland Min. & Mill. Co.* v. *Hanna,* 112 Md. 528 (76 Atl. 850, 136 Am. St. Rep. 404); *Mitchell* v. *Belknap,* 23 Me. 475. This circumstance that the shop-book rule as administered in this country is a departure from the common-law and was created by the American courts must be kept constantly in mind when examining Section 790, Or. L., to which attention will be directed later.

Shop-books were recognized at an early date in some of the colonies, but those statutes are not now important because as explained by Wigmore:

"Nothing turns upon their wording for either (as in New England) the statutes have fallen into desuetude and the rulings of the courts since the revolution have become the source of the law, or (as in North Carolina) a modern statute has superseded the early one." 2 Wig. on Evi., p. 1861, note 9.

The American shop-book rule has been based upon the ground of necessity. There were many small merchants who kept their own books and did not employ clerks or a bookkeeper; and since the parties to lawsuits were disqualified as witnesses, such merchants were nearly always without any available evidence to prove sales made by them on credit. Out of this necessity arose a rule permitting the use of a party's shop-books as evidence of goods sold and services rendered. A rule allowing the reception of books of accounts as evidence was in effect in the early 1800's in nearly all of the American courts then in existence; and all the courts which recognized such a rule did so upon the ground of necessity: *Butler* v. *Cornwall Iron Co.,* 22 Conn. 334; *Vosburgh* v. *Thayer,* 12 Johns. (N. Y.) 461; *Mitchell* v. *Belknap,* 23 Me. 475; 12 The Bench and Bar, 17; *Larue* v. *Rowland,* 7 Barb. (N. Y.) 107; *Prince Admr.* v. *Smith,* 4 Mass. 455; *Pratt* v. *White,* 132 Mass. 477.

The shop-book rule as created and applied by the American courts soon after the Revolution presents itself in two distinct forms; one of which may for convenience be designated as the New York form, and it arose out of the New Netherlands practice; while the other may be called the New England form, since it was the form which prevailed in all the New England states except possibly one. Attention will be directed first to the New York form and then to the New England form.

For more than a century prior to the Revolution the Dutch practice prevailed in the New York tribunals, and the same practice came into use in New Jersey with the early Dutch colonists. Under the Dutch practice merchants and traders could

"always exhibit their books in evidence, where it was acknowledged or proved that there had been a dealing between the parties, or that the articles had been delivered, provided they were regularly kept with the proper distinction of persons, things, year, month and day. * * Full credit was given to all such books, especially when they were strengthened by oath, or confirmed by the death of the parties." History of the Courts of Common Pleas for the City and County of New York, with an Account of the Judicial Organization of the State, by Judge Charles P. Daly. 1 E. D. Smith, XXX; *Conlin* v. *Stamler,* 17 How. Pr. (N. Y.) 399.

"In the Dutch Colonial courts," it is explained in *Conklin* v. *Stamler,* "the parties appeared before the court and made their own statement, and if they differed as to a fact which the court thought material, either party might be put to his oath, so that the objection made to this species of evidence was, in these tribunals, of less force, as the party who made the entries could be interrogated in respect to the truth or correctness of each item."

The practice of admitting books of accounts so long observed in the Dutch tribunals was the recognized usage when New York adopted its state Constitution. In *Vosburgh* v. *Thayer,* 12 Johns. (N. Y.) 461 (decided in 1815), the New York court said:

"It is believed, that the usage and the necessity of admitting such proof, has been so long sanctioned and felt in our courts of justice, that it is now too late to question the admissibility of it."

In that decision the court prescribed the elements necessary to be established as a foundation for the admission of books of accounts; for it was there declared that the books of accounts ought not to be admitted

"unless a foundation is first laid for their admission, by proving that the party had no clerk, that some of the articles charged have been delivered, that the books produced are the account books of the party, and that he kept fair and honest accounts, and this by those who have dealt and settled with him."

This is the New York rule, and the decision rendered in *Vosburgh* v. *Thayer* is the origin of it. The states of New Jersey, Michigan and Georgia followed the New York rule: *Jackson* v. *Evans*, 8 Mich. 476; *Bracken* v. *Dillon*, 64 Ga. 243 (37 Am. Rep. 70); *Conklin* v. *Stamler*, 17 How. Pr. (N. Y.) 399, 404; *Rexford* v. *Comstock*, 3 N. Y. Supp. 876; 1 Penn. L. J. 105. See also *Butler* v. *Cornwall Iron Co.*, 22 Conn. 354, 360; *Beach* v. *Mills*, 5 Conn. 494. Under the New York rule the suppletory oath, which was the distinguishing feature of the New England form of the shop-book rule, was not required or allowed: *Sickles* v. *Mather*, 20 Wend. 72 (32 Am. Dec. 521). We are informed by what is said in *Conklin* v. *Stamler*, 17 How. Pr. (N. Y.) 399, that the Constitution of the State of New York as it was when first adopted, contained a provision retaining such parts of the common-law as constituted the law of the colony before the battle of Lexington; and we are also told that in *Vosburgh* v. *Thayer*, as well as in the prior decision of *Case* v. *Potter*, 8 Johns. (N. Y.) 211, and other prior cases, the court recognized the usage which had been established, and that the existence of this usage apparently embarrassed the court because

the usage was contrary to the common-law and because the state Constitution contained the above-mentioned provision. The opinion in *Conklin* v. *Stamler* further advises us:

"The examination of these cases [*Vosburgh* v. *Thayer* and *Case* v. *Potter*] will show that the court had no very clear conception of the nature of the question before them, which was simply whether this practice was the law of the colony before the revolution; for if, by long usage and general adoption, it had, before that event, become the recognized mode of proving facts in certain cases, then it was the law of the colony instead of the opposite English rule, which, being repugnant, was not in force at the breaking out of the revolution, and was consequently not embraced in the retaining clause of the constitution. If they had known—which they probably did not know—that the rule which they found in use had existed from the time of the Dutch, and had been in practical operation for more than one hundred years, they would have found an easy solution of the difficulty by simply declaring, as the New England courts had done, that it had been in use from the earliest period of the colony, and had thus grown into a common law by general acquiescence and long established usage."

The court further said:

"But instead of simply recognizing the practice as it had prevailed in the Dutch tribunals, and declaring that the party should or could be examined under oath as to the truth or correctness of the entries made by him, they devised, as a test and safeguard, the special preliminary proof which has since been required as a condition precedent to the admission of the books."

Under the New England form of the shop-book rule books of accounts kept by a party himself were received in evidence when supported by his suppletory

oath: *Union Bank v. Knapp,* 3 Pick. (Mass.) 96 (15
Am. Dec. 181); *Missouri Pac. Ry. Co.* v. *Johnson*
(Tex.), 7 S. W. 838.   This was in imitation of the
suppletory oath of the civil law: 3 Blackstone Com.
369, 370; *Conklin* v. *Stamler,* 17 How. Pr. (N. Y.)
399; 37 Cyc. 606.   The oath was administered to the
party in court: *Frye* v. *Barker,* 2 Pick. (Mass.) 65;
4 Chamberlayne  on Evi., § 3032.   In jurisdictions
where the suppletory oath was administered a party
could not be a ''general witness,'' nor could he tell
about the contract price of the value of the articles
sold or services rendered, but he was restricted to
testimony relative to the delivery of the articles sold,
or the rendition of services, the correctness of the
entries made and to testimony that the books were
regularly and accurately kept: *Mitchell* v. *Belknap,*
23 Me. 475; *Mathes* v. *Robinson,* 8 Met. (Mass.) 269
(41 Am. Dec. 505); *Dwinel* v. *Pottle,* 31 Me. 167; 4
Chamberlayne on Evi., §§ 3082, 3144; 2 Wig. on Evi.,
§ 1554; 2 Enc. of Evi. 629; *Cummings* v. *Nichols,* 13
N. H. 420 (38 Am. Dec. 501).   See also: *Vosburgh* v.
*Thayer,* 12 Johns. (N. Y.) 461, 463; 4 Chamberlayne
on Evi., § 3055; 1 Penn. L. J. 105.   The New Eng-
land rule was followed in other jurisdictions outside
of New England.

Under the rule which for convenience we have des-
ignated as the New England rule a party wishing to
introduce books of accounts kept by himself, sub-
mitted them to the court for inspection, and if they
did not appear to be a register of the daily business
of the party and to have been honestly and fairly
kept, they were rejected.   If an erasure or alteration
in a material part appeared it was necessary to ex-
plain the erasure or alteration before the books could
be admitted.   If the books passed the inspection of

the court the party himself was required to make oath in open court that they were the books in which the accounts of his ordinary business transactions were usually kept; that the entries were made at or about the time of the transaction and were the originals, and were correctly made; that the goods therein charged were actually delivered to the defendant or that the services therein charged were actually performed for the defendant; and that the sums charged and claimed had not been paid: 1 Greenleaf on Evi. (15 ed.), p. 183, note 2.

The practice of receiving as evidence books of accounts kept by a party was repudiated by a very few courts and followed with reluctance by some; note in 138 Am. St. Rep. 441; note in 52 L. R. A. 545; but it will be found that most of the courts adopted some form of the shop-book rule; and it is a noteworthy fact, too, that in the jurisdictions beyond New England and New York the courts in the main adopted either the New York or the New England form of the shop-book rule. The form of rule observed in a few courts presented some variations; as, for example, *Hooker* v. *Johnson,* 6 Fla. 730; *Neville* v. *Northcutt,* 7 Cold. (Tenn.) 294; *Forsee* v. *Matlock,* 7 Heisk. (Tenn.) 421; see also 4 Chamberlayne on Evi., § 3082; but stated broadly the rules adopted by the different courts may be appropriately assigned, because of their distinguishing characteristics, either to the New York or to the New England classification. Thus far we have been discussing the rule applicable to books of accounts kept by a party at a time when he was disqualified to testify as a witness.

The disqualification which formerly precluded a party from testifying as a witness has been quite generally removed, and at the present time a party can

in most states testify without any more restrictions
than are imposed upon other witnesses. Notwith-
standing the shop-book rule traces its origin to a
judicial recognition of the necessity created by the
disqualification of a party to testify as a witness, the
removal of that disqualification has not, except in a
few jurisdictions, prevented the operation of the rule
or produced any material limitations upon it. The
doctrine of consistency might seem to lead to the
abolition of the rule upon the removal of the reason
that produced the rule; but granting to a party the
right to testify as a witness, has, except in rare in-
stances, had no appreciable influence upon the appli-
cation of the shop-book rule: 10 R. C. L. 1173; note
in 138 Am. St. Rep. 444; 4 Chamberlayne on Evi.,
§ 3068. At the present time nearly every state in the
Union by virtue of a statute or by force of judicial
decision makes books of accounts kept by a party
competent as evidence; and it will be found that now
just as before removal of the disqualification of a
party to testify the several states may be classed as
those applying the New York rule and as those
applying the New England rule. There are, as is
to be expected, variations now observable in some
jurisdictions just as there were variations in a few
states at an earlier date; and it may be added that
the variations from the original type now to be found
are larger in number and in not a few instances more
marked in degree than before. In New York the doc-
trine of *Vosburgh* v. *Thayer* is still followed: *Smith*
v. *Smith*, 163 N. Y. 166 (52 L. R. A. 545, 57 N. E.
300). A few states have enacted statutes containing
some or most of the essential features which charac-
terize the New York rule; as, for example, Alabama;
Code of Alabama (1907), Section 4003; Georgia;
Park's Annotated Code of Georgia (1914), Section

5769; see also *Bracken* v. *Dillon,* 64 Ga. 243 (37 Am.
Rep. 70); New Mexico, N. M. Statutes, Ann. (1915),
Section 2187.

Although some of the present day legislation relative to the use of books of accounts follows more or
less closely the New York doctrine, it will be found,
upon examination of existing statutes, that most of
the statutes now in force in the United States, so far
as they relate to the foundation required to be laid
for the introduction of the books, contain so many of
the features of the New England doctrine that it can
be appropriately said that most of the present day
legislation is in accord with the New England rather
than with the New York rule. A number of states,
including several western states, have no legislation
regulating the use of shop-books; while one of such
western states requires evidence showing that a party
kept no clerk, as is required by the New York rule,
nearly all the remainder of such western states seem
to recognize the essentials of the New England rule:
*Watrous* v. *Cunningham,* 71 Cal. 30 (11 Pac. 811).

1. It must be remembered, of course, that a party
can now, by reason of the removal of the former disqualification, testify as a witness to the same facts
which he could have related under the suppletory
oath; indeed, he can go further, for he can now in
most jurisdictions, Oregon included, testify without
any more restrictions than are imposed upon any
other witness: Section 731, Or. L. Under the New
England rule a party testifying as a witness may
now say all that he could have said under the suppletory ·oath; and while he may, because of being
permitted to testify generally as a witness, now say
more than he would have been permitted to say under
the suppletory oath, he must now say all that he would

have been obliged to say under the suppletory oath, before his books of accounts are admissible.

2. In Oregon there is no statute regulating the use of shop-books as evidence. Section 791, Or. L., provides:

"When an entry is repeated, in the regular course of business, one being copied from another, at or near the time of the transaction, all the entries are equally regarded as originals."

3. Undoubtedly this section is general in its scope and applies to entries in shop-books as well as to any other entries which may be said to come within its embrace. We also have in this jurisdiction a statute, Section 790, Or. L., regulating the admissibility of entries made by persons deceased or without the state; and it reads as follows:

"Writings of Deceased Persons, or Persons Without the State, Admissible in What Cases. The entries or other writings of like character of a person deceased or without the state, made at or near the time of the transaction, and in a position to know the facts stated therein, may be read as primary evidence of the facts stated therein, in the following cases:—

"1. When the entry was made against the interest of the person making it; or

"2. When it was made in a professional capacity, and in the ordinary course of professional conduct; or

"3. When it was made in the performance of a duty specially enjoined by law."

The States of California, Idaho, Montana and Utah have a statute identical with or nearly the same as Section 790, Or. L., but like Oregon, neither of those States has any statute, except possibly one like Section 791, Or. L., in any way applicable to shop-books: Kerr's Cyc. Codes of California, Vol. 3 (1905),

§ 1946; 2 Idaho Compiled Statutes (1919, § 7967; 3 Revised Codes of Montana, § 10595; Compiled Laws of Utah (1917), § 7113.

4. It would be difficult by any course of logical reasoning to declare that the shop-book rule is recognized in this state and at the same time say that Section 790, Or. L., affects books of accounts when used under the shop-book rule. Section 790, Or. L., traces its origin to a source entirely separated from the shop-book rule. The general rule is that entries of a third person of transactions between such third person and others not parties to the litigation, or one of the parties litigant are not admissible because they are hearsay and *res inter alios acta;* but under one of the exceptions to this general rule entries against the interest of the person making them, the entrant being dead, are admissible: 2 Enc. of Evi. 667–670. Another exception to the hearsay prohibition recognized by the common law was the established doctrine which permitted the reception of written entries made by deceased persons in the usual course of professional or official business or in the discharge of some duty. This doctrine rests upon its own basis and has its own history. It is treated by text-writers as a rule which is separate and apart from the shop-book rule, and, although these two rules have points of similarity in that each possesses some of the same features, yet neither rule is connected with or dependent upon the other. There was a good reason for the enactment of Section 790, Or. L., and that reason is found in the fact that it was the plain purpose of the legislature to codify the rule governing entries of third persons against interest and especially to limit the scope of the common-law rule governing entries made by deceased persons in the course of professional or official busi-

ness, or in discharge of some duty, as that rule was applied in America. In the absence of legislation restricting the scope of its operation this common-law rule relating to entries made by deceased persons in the usual course of professional or official business or in the discharge of some duty was and is given a much more liberal application by American courts than by the English courts; and this difference in the application of the common-law rule furnishes the principal reason for the enactment of Section 790, Or. L. Manifestly the legislature realized that if no statute were enacted the courts of this state would give to the common-law rule its American application, and in order to prevent such liberal application the legislature enacted the statute.

5. Sometimes it is difficult, as pointed out by Professor Wigmore, to know whether a given statute is applicable to this common-law rule relative to entries of deceased persons or whether it governs shop-books used as such under the shop-book rule; and this difficulty has not infrequently caused confusion. Shop-books are received because they are the books of accounts of a party, and they are so received without regard to whether the entrant is dead or alive; but the entries covered by Section 790, Or. L., and the common-law rule of which the statute is a codification makes the admissibility of the entries dependent upon the death of the entrant. Moreover, an entry may for various reasons be admissible under Section 790, Or. L., and yet be inadmissible under the shop-book rule. An entry may be made in a book or paper and be admissible under Section 790, Or. L., and yet the book or paper may be entirely outside of the pale of the shop-book rule.

6. The shop-book rule applies to the books of one party to show sales made to or services rendered for

the other party. Section 790, Or. L., is a codification of the common-law rule applicable to entries made by strangers to the litigation. Under the shop-book rule the entries must generally be made in a shop or account book, while under the other rule they may be made in any book or document: 1 Elliott on Evi., § 477.

Under the shop-book rule as administered in New England, the books of accounts of a party were admissible upon proof of the death of the entrant whether he was a party or the clerk of a party; and so, too, if the clerk who kept the books of accounts had removed permanently from the jurisdiction of the court a party could upon proof of such removal introduce the books as evidence. Now suppose a blacksmith performs services or a merchant sells goods on credit and the blacksmith or his helper keeps the blacksmith's books or the merchant keeps his books and the entrant dies: Could it be said in either instance that the entries showing charges for services rendered or for goods sold were entries against the interest of the entrant or that they were made "in a professional capacity, *and* in the ordinary course of professional conduct," or that they were "made in the performance of a duty specially enjoined by law"? If Section 790, Or. L., were applied in the administration of the shop-book rule it would practically restrict the operation of that rule to cases where the entrant is living and within the state, for only a limited number of cases could by any stretch of the imagination be brought within any of the classes specified by Section 790. Moreover, some states have statutes like Section 790, Or. L., and also separate statutes purporting to codify the shop-book rule, thus indicating the legislative intent to continue the common-law rule relating to entries of deceased

persons and also the shop-book rule with each oper-
ating independently of the other.   See Compiled Code
of Iowa (1919), Sections 7329, 7330; The Compiled
Statutes of Nebraska (1922), Section 8846.   Our con-
clusion is that Section 790, Or. L., does not affect the
shop-book rule: 4 Chamberlayne on Evi., §§ 2870–
2909, and §§ 3051–3149; 2 Wig. on Evi., §§ 1517–1651;
1 Elliott on Evi., §§ 454–475, and §§ 476–494 and
especially § 477.

There is then no statute in this jurisdiction gov-
erning the use of shop-books as evidence.   However,
the judiciary have recognized the right to introduce
shop-books as evidence: *Friendly* v. *Lee,* 20 Or. 202
(25 Pac. 396); *Durkheimer* v. *Heilner,* 24 Or. 270
(33 Pac. 401, 34 Pac. 475); *Harmon* v. *Decker,* 41 Or.
587 (68 Pac. 11, 1111, 93 Am. St. Rep. 748); *Raski*
v. *Wise,* 56 Or. 72 (107 Pac. 984); *Mason* v. *Melhase,*
64 Or. 522 (130 Pac. 1134); *Stuart* v. *Camp Carson
Min. Co.,* 84 Or. 702 (165 Pac. 359).   At an early date
in the history of this state this court declined to
decide whether allowing the party to testify as a
witness precluded him from using his books of ac-
counts under the shop-book rule; *Henderson* v. *Morris,*
5 Or. 24, 29; but since that time the court has pro-
ceeded upon the assumption that the removal of the
disqualification of a party to testify as a witness
did not affect the right to use his shop-books.   Here-
tofore it has not been deemed necessary to distinguish
between the New York and the New England rules,
and consequently in several of our precedents may
be found citations from New York and in company
with them citations from New England states.   Some-
times, too, our precedents contain references to cases
dealing with the use of writings to refresh the mem-
ory.   However, the uniform practice in the trial
courts has been to receive shop-books, and the gen-

eral practice, as we understand it, has been to require
the laying of a foundation containing the essentials
of what we have designated as the New England rule;
and we approve such practice.

7. The books must appear to have been honestly
kept. Evidence of mutilation or alteration requires
a satisfactory explanation: 2 Wig. on Evi., § 1557;
2 Enc. of Evi. 612. The books must be books of
original entry: 4 Chamberlayne on Evi., § 3085. The
entries must have been made in the regular course
of the entrant's business or employment: 2 Wig. on
Evi., § 1546; 4 Chamberlayne on Evi., § 3101. The
entries must have been fairly contemporaneous with
the transactions entered: 2 Wig. on Evi., § 1550.
Even though a party made the entries himself he
need not offer testimony as to his reputation for cor-
rect and honest accounting, for such character of
testimony is one of the features of the New York
rule. The party may himself testify directly to the
correctness of his book: Note in 138 Am. St. Rep.
448. See 2 Wig. on Evi., § 1552. Nor, if a party has
been his own bookkeeper, need he prove that he had
no clerk helping him, for such proof is also one of the
essentials of the New York doctrine: See 2 Wig. on
Evi., § 1538; note in 138 Am. St. Rep. 446. In this
connection it is proper to direct attention to the fact
that a clerk within the meaning of the New York doc-
trine does not mean a mere bookkeeper but it means
"one who had something to do with and had knowl-
edge generally of the business of his employer in ref-
erence to goods sold or work done, so that he could
testify on that subject. * * and thus is able to prove
an account." *McGoldrick v. Traphagen,* 88 N. Y. 334,
338.

8. The entrant, if available, must ordinarily be
called as a witness, or facts should be shown sufficient

to excuse his absence: 4 Chamberlayne on Evi., § 3070. The entrant must testify that the books were correctly kept: 2 Wig. on Evi., § 1554.

9. However, in some instances, as, for example, where there is a head bookkeeper and the entries have been made by a subordinate bookkeeper, the correctness of entries in books may be proved by any person who is able of his own knowledge to testify to the correctness of the entries: Note in 138 Am. St. Rep. 448. If the entries were made by a clerk who is dead, insane or physically unable to attend as a witness, or is removed permanently from the jurisdiction of the court, the books may be made admissible by proof of his handwriting: 4 Chamberlayne on Evi., §§ 3069, 3070; note in 15 Am. Dec. 193.

10. Personal knowledge on the part of the one who made the entry is, broadly speaking, essential: Note in 15 Am. Dec. 197; 2 Wig. on Evi., § 1555. The entrant must generally know of his own knowledge the truth of the transaction which he enters: 4 Chamberlayne on Evi., §§ 3071, 3072; 1 Elliott on Evi., §§ 455, 458, 462. If the entrant made the entries upon reports of another who had personal knowledge of the transactions reported by him, then the entrant ought to be produced and required to testify that he made the entries correctly in conformity with the reports; and his testimony should be supplemented by the testimony of the one who made the reports so that their combined testimony would be equivalent to the testimony of an entrant having personal knowledge: 2 Wig. on Evi., §§ 1530 and 1556; note in 36 L. R. A. (N. S.) 900, 902; 4 Chamberlayne on Evi., § 3074; 2 Enc. of Evi. 627; *House* v. *Beak,* 141 Ill. 290 (33 Am. St. Rep. 307, 30 N. E. 1065); *Gould* v. *Hartley,* 187 Mass. 561 (73 N. E. 656).

It is not necessary that the entrant, when testifying, shall at that time have an independent recollection of the transactions entered, but he must be able to say that at the time when he made the entries he had personal knowledge of the transactions and that the entries were made correctly and in conformity with such knowledge: 2 Enc. of Evi., 634; *Merrill* v. *Ithaca & Owego R. R. Co.,* 16 Wend. (N. Y.) 586 (30 Am. Dec. 130).

11. When the entrant appears as a witness and testifies that at the time of making the entries he had knowledge of the transactions entered and that he made the entries in accordance with the truth, there is not, in the final analysis, a total lack of evidence concerning the delivery of the goods sued for. In this connection it may be of interest to observe that one writer intimately acquainted with the New York rule has declared that the New York requirement of proof of delivery, independent of the books, of part of the goods sued for was devised in order to have common-law proof of at least some part of the account before the books are admitted as proof of the balance: 12 Bench and Bar, 14, 22.

12. It is not necessary, in order to make the books admissible, that some witness shall testify that he then recollects, independently of the books, that some of the articles were delivered. The admissibility of the books does not depend upon independent evidence of delivery although the lack of such independent evidence may affect the weight of the books. There are of course holdings to the contrary.

13. If the entrant, the bookkeeper, or the transactor, the person who makes the reports to the bookkeeper, is unavailable because of death, insanity, physical disability or permanent absence from the jurisdiction of the court, the offerer may be excused from producing

such entrant or transactor. The excuse is based upon the idea of unavailability.

14. It may be that entries are made on the faith of reports involving many items handled by many clerks, salesmen, teamsters and the like; and such a situation may likewise present a case of unavailability and thus excuse the production of all the persons who have contributed their knowledge in making up the items of voluminous accounts. In the language of Professor Wigmore the excuse in such a case is based upon the ground of "mercantile inconvenience." 2 Wig. on Evi., §§ 1521, 1530, 1555; 4 Chamberlayne on Evi., § 3074. If the practical inconvenience resulting from the production of numerous persons outweighs the probable utility of doing so, the offerer of the books may be excused from producing such numerous persons: *Missouri, K. & T. Ry. Co.* v. *Davis,* 24 Okl. 677 (104 Pac. 34, 24 L. R. A. (N. S.) 866); *West Virginia Architects & Builders* v. *Stewart,* 68 W. Va. 506 (70 S. E. 113, 36 L. R. A. (N. S.) 899). See also *Seaboard Air Line Ry.* v. *Railroad Commrs.,* 86 S. C. 91 (67 S. E. 1069, 138 Am. St. Rep. 1028).

There is a contrariety of judicial opinion as to whether books of accounts are original or secondary evidence, but it seems to us that under the New England doctrine books admitted under the shop-book rule ought logically to be received as original evidence, and this seems to be the majority view: *Friendly* v. *Lee,* 20 Or. 202, 204 (25 Pac. 396); *Mathes* v. *Robinson,* 8 Met. (Mass.) 269 (41 Am. Dec. 505); 22 C. J. 864; 4 Chamberlayne on Evi., §§ 3056, 3076, 3081; 10 R. C. L. 1174.

15. The existence of other testimony does not prevent the admission of books under the shop-book rule: 2 Wig. on Evi., § 1544; note in 138 Am. St. Rep. 445;

*Doty* v. *Crawford,* 39 S. C. 1 (17 S. E. 377). Upon this question the courts are at variance just as they disagree as to whether the books are original or secondary evidence: *Bracken* v. *Dillon,* 64 Ga. 243 (37 Am. Rep. 70).

16. The court passes upon the admissibility of the books and the jury pass upon their weight: *Mason* v. *Melhase,* 64 Or. 522, 529 (139 Pac. 1134); *Henshaw* v. *Davis,* 5 Cush. (Mass.) 145; *Seaboard Air Line Ry.* v. *Railroad Commrs.,* 86 S. C. 91 (67 S. E. 1069, 138 Am. St. Rep. 1028).

17. The books, when received, are *prima facie* evidence of the pertinent entries therein contained, including the delivery of the articles specified and the values thereof: 3 Jones on Evi. (Horwitz ed.), § 567 (582); *Friendly* v. *Lee,* 20 Or. 202, 204 (25 Pac. 396); 2 Enc. of Evi. 642; 138 Am. St. Rep. 465 and 467; 10 R. C. L. 1186; *Harmon* v. *Decker,* 41 Or. 587, 594 (68 Pac. 11, 1111, 93 Am. St. Rep. 748).

In the instant case the sheets from the day-book, although made up from the sales slips, constituted the first permanent record of the alleged transactions and compose a book of original entries: *Ladd & Bush* v. *Sears,* 9 Or. 244; *State* v. *Stephenson,* 69 Kan. 405 (76 Pac. 905, 105 Am. St. Rep. 171, 2 Ann. Cas. 841); 10 R. C. L. 1182. Loose-leaf books are competent: 22 C. J. 870.

If a sufficient foundation had been laid the sheets from the day-book would have furnished enough evidence to take the case to the jury; but a sufficient foundation was not laid. For aught that we can know from the record, Radtke may have had no knowledge whatever of the transactions entered except as he was informed by the slips. The sales, if made, may have been made by one or more clerks. The clerks, if any there were, must, if available

within the meaning of the rule governing availability, be produced and furnish testimony in verification of the sales slips. Moreover, it is only by doubtful inference that we could say that there was any evidence tending to show that the entries were made in conformity with the slips. The judgment is reversed and the cause is remanded.

REVERSED AND REMANDED.