# Lowenstein, Appellant, v. Greenbaum.

*Evidence—Mercantile record and writings—Delivery of goods.*

In an action to recover for merchandise sold and delivered, where the defendants deny that they ever received any of the goods, the plaintiff may offer in evidence various records made during the process of packing and shipping the goods, such as the yardage memorandum, entries in invoice book, invoices, memorandum receipt signed by shipping ·clerk, and receipt of drayman, where the chief clerk of the packing department testifies as to the whole process of packing and shipping which was under his own supervision, identifies the records and testifies that they were made by his own immediate subordinates, and that they were in the handwriting of such subordinates. In such a case the plaintiff is not required to call as witnesses the various employees to identify the records which they had respectively made.

Argued Dec. 16, 1915.   Appeal, No. 364, Oct. T., 1915, by plaintiffs, from judgment of Municipal Court, May T., 1915, No. 381, for defendant n. o. v. in case of M. Lowenstein & Sons v. Harry Greenbaum.   Before RICE, P. J., ORLADY, HEAD, PORTER, HENDERSON, KEPHART and TREXLER, JJ.   Reversed.

Assumpsit for goods sold and delivered.

The facts are stated in the opinion of the Superior Court.

*Error assigned* was in entering judgment for defendant n. o. v.

*Walter C. Longstreth,* with him *John M. Dredger, Jr.,* for appellants.—Business records constitute one of the exceptions to the rule against hearsay: Wells Whip Co. v. Tanners Mut. Fire Ins. Co., 209 Pa. 488; Canfield v. Johnson, 144 Pa. 61.

A business record is admissible in evidence where the information entered upon the record has been furnished

by an employee now outside the State: Riche v. Broadfield, 1 Dallas 16.

*Alfred Aarons*, with him *Henry N. Wessel*, for appellees.—In the recent case of Harkness v. Swissdale Boro., 238 Pa. 544, the Supreme Court decided that entries made in hospital records in the usual course of business were mere hearsay and that the facts must be proven by the best evidence, to wit, the testimony of the person cognizant of the facts entered.

In Ramble v. Penna. Coal Co., 53 Pa. Superior Ct. 438, entries on check stubs were rejected because they were mere self-serving declarations.

There was neither testimony nor entry to show what had become of the goods after the case had been packed: Speare v. P. & R. R. Co., 47 Pa. Superior Ct. 639; Castellucci v. Lehigh Val. R. R. Co., 40 Pa. Superior Ct. 24; Wright v. Adams Express Co., 54 Pa. Superior Ct. 485; Isdaner v. Philadelphia & Reading R. R. Co., 54 Pa. Superior Ct. 509.

OPINION BY HEAD, J., October 9, 1916:

The plaintiffs sue to recover the price of a case of merchandise said to contain 4,133 yards of sateen at eight and one-fourth cents per yard alleged to have been sold and delivered to defendant. The averments of the amended statement, not specifically denied, and the uncontradicted evidence offered in support of them, leave no doubt the goods were ordered and the price thereof agreed upon. These questions are thus removed from the controversy. The real and practically the only issue to be determined at the trial was whether or not the packing case containing the goods had been delivered to the defendant. Its receipt having been denied in the answer, the burden of proof was on the plaintiffs. The cause was tried before a judge without a jury. He found generally for the plaintiffs subject to a reservation of the question of the admissibility of the line of evidence

offered by them.   Upon consideration of the point reserved, the court in banc held the evidence should have been rejected and entered judgment for the defendant. The plaintiffs appeal.

In discharge of the burden cast upon them by the pleadings, the plaintiffs started their line of proof by showing they had ordered the goods required by the defendant from the Dempsey Bleachery & Dye Works at Pawtucket, R. I.   They first called J. J. O'Leary who testified he was the chief clerk of the firm or company named, had general supervision of the work pertaining to the office and packing room and charge of the records of all cases of goods packed and shipped, such records having been made under his own supervision by his immediate subordinates.   He described the regular routine which was gone through with every case of goods packed and shipped by his department.   There were four employees known as folders or measures.   When an order was to be filled, one of these four employees folded and measured the pieces of goods required and made out, in his own handwriting, a memorandum of the yardage which was inserted in a fold of the goods.   The yardage was then given by him to one of four other employees known as tag clerks.   This clerk stamped on a tag the amount of the yardage and the tag was fastened to the goods so that it could be seen and read without unfolding the piece.   The several pieces were then turned over to a packer whose duty it was to pack them in a proper case and call to the invoice clerk the number of yards in each piece.   The invoice clerk entered in a book the number of yards in each piece and the total number in all of the pieces packed in the case.   From this book he made up the bill or invoice which was to go to the purchaser. When the goods had been properly packed in the case, it was turned over to the shipping clerk who gave a memorandum receipt.   It passed from him to a drayman or expressman who also receipted for it, and he delivered it to the railroad company for shipment and obtained a

receipt or bill of lading from the carrier.   Although, as we have said, the witness produced these various records, with the exception of those attached to the goods themselves, identified the handwriting of the various employees through whose hands the case had passed, and declared they were all made in the regular and ordinary course of business and under his immediate supervision, these records were rejected by the learned court below because, legally speaking, they had no probative value. By lines of proof of substantially the same character the plaintiffs sought to trace the case of merchandise to their own place of business in New York and its subsequent delivery to another railroad company by which it was carried to Philadelphia and delivered to the drayman of the defendant.

We are urged to say that all of these records were but hearsay, and as all of the employees through whose hands the case of merchandise passed were not called as witnesses, the plaintiffs' case failed for want of proof. We do not understand the law to be so.   The chief clerk could identify the written memorandum made by each employee from a knowledge of his handwriting just as well as could the employee himself were he placed upon the stand.   It is unreasonable to suppose that upon the trial of the case, one or two years after the transaction had occurred, any one of these employees would have any personal recollection of any single one of the multitude of similar transactions where their shares in that transaction were routine, administrative and practically automatic.   If records so made up have no probative value, it is impossible to see how any manufacturing establishment, department store, or other like enterprise conducted on a large scale, could establish the liability of a purchaser who had bought small articles of their respective products or wares.

The principles underlying rules of evidence are founded in the common experience of men.   Their aim and object are to aid the administration of justice in the courts

by the use of means long recognized as helpful in the ascertainment of the truth. Passion, prejudice and self-interest are powerful in obscuring the moral vision of human beings. The sanction of an oath and the right of cross-examination have for ages been regarded as of great help in eliciting testimony because, by their aid, the evil effects of the forces to which we have referred are removed or minimized. But when the reason for the application of a rule of evidence ceases, the rule itself is discarded, and there have always been what are frequently called exceptions to such rules. For instance, unsworn declarations made spontaneously, in connection with some transaction which afterwards becomes the fact to be litigated, are said to be part of the res gestæ and therefore admissible in evidence. The theory is that under such circumstances there is no likelihood such declarations would spring from any objectionable source and therefore the usual safeguards are not necessary. On the same principle those unsworn statements which are called dying declarations have always been admissible, the imminence of death being supposed to exclude the idea the declarant would utter anything but that which he believed to be true.

The general treasury of legal learning on this subject has been greatly enriched in recent years by the publication of two masterly works in which the principles of evidence have been historically traced to their origin and their evolution and development have been described and expounded in a reasoning and philosophic way. We refer of course to the Works of Professor John Wigmore and Charles Frederick Chamberlayne. In speaking of a situation like the one presented by this record, the first of these learned authors uses this language in Vol. II, Sec. 1530: "In such a case, it should be sufficient if the books were verified on the stand by a supervising officer who knew them to be the books of regular entries kept in that establishment, and the production on the stand of a regiment of bookkeepers, salesmen, shipping clerks,

teamsters, foremen, or other subordinate employees, should be dispensed with. No doubt much should be left to the discretion of the trial court......But the important thing is to realize that upon principle there is no objection to regarding this situation as rendering in a given case the production of all the persons as impossible as in the case of death......It would seem that expedients which the entire commercial world recognizes as safe could be sanctioned, and not discredited, by courts of justice.......In short, the courts must here cease to be pedantic and endeavor to be practical."

Mr. Chamberlayne, discussing the same question in Chapter 42, Sec. 2881, says: "For the admissibility of the evidence, the important consideration is that the witness is unavailable. The precise cause of his being so may properly be regarded from the standpoint of sound administration as being really immaterial. Modern conditions of doing business have introduced a new element of unavailability, that of practical inconvenience. Temporarily withdrawing all the persons connected with the sale, charge or delivery of even a single item in an account of sales might cause, in many instances, a dislocation in the smooth running of a large establishment, a result which would be quite disproportionate in producing annoyance and expense, to the value which the administration of justice could fairly be expected to gain from their fragmentary testimony.......With the great increase in the volume of business handled by many mercantile houses and the very large and highly specialized departments into which the business is customarily divided, each in a sense ignorant of the actual doings of the others, an administrative necessity arises for recognizing other forms of unavailability than those regarded as valid by earlier judges........The personal memory of a witness regarding one among a large number of similar transactions would necessarily be so vague and fragmentary as merely to amount to an assertion of the accuracy of the books."

At another place the same learned author adverts to the principle we are discussing in this language: "In the second place the relevancy of the automatic utterance, most frequently perhaps in writing, may be due to the machine-like precision arising from the continued repetition of a limited number of acts where a witness, for example, is shown to have been in the habit of repeating, in the discharge of some private or public duty, a given action with no bearing known to him upon his own interest, it may well be taken to have been made with competent knowledge and without motive to misrepresent.......Prominent illustrations of the probative force of facts possessing this relevancy may be seen in the case of routine acts done in the discharge of official duty or in connection with the use of shop books and books of account. When unsworn statements are shown to have been made under the reflex action of either spontaneity or regularity, they are accorded admissibility by the modern law of evidence."

In Wells Whip Co. v. Tanners Mut. Fire Insurance Co., 209 Pa. 488, the Supreme Court was considering the admissibility of an inventory of a stock of goods which had been made up by the subordinates of the witness who testified and under his supervision. The inventory was admitted by the learned trial judge and this was assigned for error. In the course of his opinion Mr. Justice THOMPSON says: "Appellant's objection that this proof was secondary, because the men who actually counted the articles and weighed the materials were not called lacked substance, for the reason that the inventory was made under the directions of the witness and was duly verified by him." In Canfield v. Johnson, 144 Pa. 61, the plaintiff called as a witness the station agent of a coal company at Wellsboro and he produced a way-bill made up by the agent at Corning showing a certain shipment and the amount of freight charges thereon. The plaintiff offered this way-bill in evidence. It was objected to on the ground that it was but the unsworn declaration of one

who was not produced as a witness. The learned trial judge sustained this objection and refused to admit the way-bill. In commenting upon the action of the trial court in rejecting this with other offers of evidence, Mr. Justice Green says: "The original freight-bills, containing upon their face the precise amounts of freight paid, were rejected for untenable reasons."

Without further elaborating this interesting question, we have said enough to indicate the grounds on which we rest our judgment that the learned court below fell into error in rejecting the proof offered by the plaintiffs of the character to which we have referred. It is true the evidence showed some confusion as to the marking of the case which was actually delivered at or about the time when the case in question should have reached its destination. The defendant was unable to produce any testimony which was materially helpful in dispelling this confusion. His own manager witness testified that at that time but very little, if any, record was kept by the defendant to show the contents of any particular case of merchandise received by him. But the plaintiffs were not required to furnish a demonstration that the case in question which started from Pawtucket was finally delivered to the defendant. It would be sufficient, if from the weight of the relevant evidence admitted, the trial tribunal could reach the conclusion that the merchandise was in fact received by the defendant, and this fact the trial judge necessarily found, or there could have been no general finding for the plaintiffs.

We are of opinion the finding of the trial judge was supported by the evidence which he received but which was afterwards stricken from the record by the court in banc. The plaintiffs were therefore entitled to the benefit of their verdict and judgment in their favor should have been entered thereon.

The judgment is reversed and the record remitted to the court below with direction to enter a judgment for the plaintiffs on the finding of the learned trial judge.