## E. I. DU PONT DE NEMOURS & CO. v. TOMLINSON et al.

(Circuit Court of Appeals, Fourth Circuit. February 5, 1924.)

No. 2118.

1. **Trover and conversion** ⬥66—**Evidence of ownership held to require directed verdict.**

Evidence *held* to establish beyond reasonable doubt that carloads of nitrate shipped and sold to defendants by a third party were the property of plaintiff.

2. **Evidence** ⬥376(6)—**Railroad records held admissible without production of employés who made the entries.**

Records of a railroad company at a seaport terminal where large shipments were received from vessels, made contemporaneously, in the regular course of business, and as a part of its system, showing the contents of specifically numbered cars, from what ship loaded, and their destination, which records were written by employés and made up from duplicate receipts given the shippers, written shipping directions, and other memoranda, when authenticated by the person under whose direction they were made, *held* admissible in suits between third parties as

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

evidence of the ship from which a particular car was loaded, without
the production of the employés who made the entries.

**3. Courts ⬡⇒348—Rules of evidence established by decision of state courts as rules of decision in federal courts.**

Whether the rules of evidence established by decision of the Supreme Court of the state govern in the federal courts in that state, under Rev. St. § 721 (Comp. St. § 1538), considered, but not decided.

In Error to the District Court of the United States for the Eastern District of North Carolina, at Raleigh; Henry G. Connor, Judge.

Action at law by E. I. Du Pont de Nemours and Co., a corporation, against Louis S. Tomlinson and others, partners as the Tomlinson Guano Company, and others, with six other actions. Judgments for defendants, and plaintiff brings error. Reversed.

Edward R. Baird, Jr., of Norfolk, Va., and V. S. Thomas, of Wilmington Del. (H. G. Connor, Jr., of Wilson, N. C., and Baird, White & Lanning, of Norfolk, Va., on the brief), for plaintiff in error.

P. W. McMullan, of Elizabeth City, N. C., and J. S. Manning, of Raleigh, N. C. (Manning & Manning, of Raleigh, N. C., and W. A. Lucas, of Wilson. N. C., on the brief), for defendants in error.

Before WOODS and ROSE, Circuit Judges, and SOPER, District Judge.

SOPER, District Judge. Separate suits were brought by E. I. Du Pont de Nemours & Co. against seven defendants in the District Court of the United States for the Eastern District of North Carolina. The object of the suits was to recover the value of a large quantity of nitrate of soda which the plaintiff claimed was its property, but had been stolen by its agent, a certain W. B. Tredwell, and wrongfully sold by him to the defendants. Similar facts were involved in the cases of Tredwell v. U. S. (C. C. A.) 266 Fed. 350; Whitehurst v. U. S. (C. C. A.) 272 Fed. 46; Richmond Guano Co. v. E. I. Du Pont de Nemours & Co. (C. C. A.) 284 Fed. 803; Richmond Guano Co. v. W. R. Grace Co. (C. C. A.) 284 Fed. 801. In the first case a judgment against Tredwell entered upon a verdict of guilty of larceny of nitrate from the United States was affirmed, and in the other cases judgments in favor of the owners against the purchasers from Tredwell of stolen nitrate were likewise affirmed.

The cases at bar, by consent, were tried together. In each case the trial judge framed and submitted to the jury three issues namely:

(1) Was the plaintiff the owner of the nitrate in question?

(2) Did the defendants unlawfully convert the nitrate to their own use?

(3) What damages, if any, is the plaintiff entitled to recover from the defendants by reason of such unlawful conversion?

The substantial issue was the first, for it was conceded that if the plaintiff owned the nitrate it was entitled to a verdict. The jury decided this issue in each case for the defendant.

The contention of the plaintiff was that the evidence of ownership by it of the nitrate was clear, convincing, and uncontradicted, and it

therefore requested the court to direct a verdict in each case for the plaintiff. The court overruled this motion, and submitted the issue above outlined, from which action the plaintiff appealed. It becomes necessary, therefore, to examine the testimony presented to the court.

Between October, 1917, and June, 1918, the plaintiff imported from Chile, in 13 ships chartered by it, a large quantity of nitrate of soda. The material was intended exclusively for its own use in the manufacture of explosives at its principal plant at Hopewell, Va., and also at its other plants in the United States. The vessels were entered at the United States custom house at Norfolk, Va., and were unloaded at the terminal docks of the Norfolk & Western Railroad Company at Lambert's Point, near that city. These facts were substantiated by the production of the Chilean nitrate contracts and invoices, by the bills of lading and charter parties of the vessels, and by the official records of the custom house at Norfolk.

W. B. Tredwell was employed by the plaintiff as a stevedore to unload the vessels. He was given a power of attorney by the plaintiff to enter the vessels on its behalf at the custom house. He was given shipping directions by the plaintiff after the railroad cars were loaded, and was authorized to transmit these directions to the railroad company. He had no authority to sell the material to the defendants or to any one else. As a matter of fact, none of the material was sold by the plaintiff to the defendants. He was also employed by the railroad company as a stevedore to load the nitrate into its cars. The circumstances of his employment by the plaintiff and by the railroad are not disputed.

At the time that each of the ships was being unloaded Tredwell caused from one to three cars to be loaded with nitrate, and consigned to one or another of the defendants. The quantities thus shipped were substantial, ranging in value, as to each defendant, from $5,000 to $18,000, approximately, but the shipments were small in comparison to the quantities imported by the plaintiff. For instance, 3 cars out of a total cargo of 222 cars were improperly diverted. It appears that the defendants purchased and paid for the shipments in good faith, through De Jarnette, a broker, who had died before the trial. Tredwell was also dead at that time. The receipt of the material by the defendants and its appropriation to their use is admitted or uncontroverted.

The defendants contend that there was not sufficient proof that the nitrate purchased by them came from the cargoes imported by the plaintiff, or at least that the evidence on this point was so doubtful as to require the submission of the first issue to the jury. In order to establish the connection, the plaintiff offered in evidence the records of the Norfolk & Western Railroad Company at Lambert's Point. They showed, in general, the vessels which docked at Lambert's Point during 1917 and 1918; what portion of the cargoes of such vessels were loaded into cars; when the cars were loaded and shipped, and the destination thereof. With reference to the cars of nitrate received of the defendants, the records showed that in each instance the merchandise formed part of the cargo of one or another of the vessels

under charter by the plaintiff. On their face, therefore, the records furnished convincing proof of the plaintiff's ownership of the nitrate in question, and constituted a connecting link between the nitrate imported by the plaintiff and the nitrate purchased and appropriated by the defendants.

If, then, the credibility of the records was not impeached, there was no question to submit to the jury. Under such circumstances, it would become the duty of the trial court to direct a verdict for the plaintiff. It is well settled by the decisions, and conceded by the defendants, that a federal court may withdraw a case from the jury altogether, and direct a verdict for the plaintiff or defendant, when the evidence is undisputed or of such conclusive character that the court, in the exercise of a sound judicial discretion, would be compelled to set aside a verdict returned in opposition to it. Patton v. Texas & Pacific Railroad Co., 179 U. S. 658, 21 Sup. Ct. 275, 45 L. Ed. 361.

Since the records were admitted in evidence by the trial court, let us first consider their probative force. They are attacked by the defendants chiefly on the ground that the information upon which they were based was furnished by Tredwell, a person who has since been convicted of the larceny of nitrate under similar circumstances. It is pointed out that vessels containing nitrate of other importers were docked at Lambert's Point at the same time as the plaintiff's ships; that Tredwell, as stevedore, also discharged them; and it is suggested that for purposes of his own he might have reported falsely to the railroad as to the origin of the nitrate loaded by him into the cars. No evidence is offered to support this theory. It is urged merely as a possibility. It gives rise to the conjecture whether the nitrate purchased by the defendants was stolen from the plaintiff or from somebody else.

The railroad records do not depend entirely upon Tredwell's uncorroborated word. He was agent of both the plaintiff and the railroad company. He had authority to give shipping directions to the railroad company, and had, therefore, ample opportunity to commit the particular crime and misappropriate the particular goods in question. His work was not entirely without supervision. Officers of the plaintiff company were frequently on the pier and in the railroad office during the unloading of the ships. Clerks of the railroad company, engaged in sealing the very cars in question, were constantly on the piers, and had ample opportunity to observe the discharge of cargo from the plaintiff's ships into the cars. The railroad officials undoubtedly relied upon Tredwell for detailed information as to the ships from which the cars were loaded, but opportunities for independent observation were not lacking. It is a significant fact that in each case the vessel from which Tredwell claimed to have loaded the cars was at that particular time alongside the pier in the course of unloading. It is equally significant that the defendants offered no evidence excepting as hereinafter noted to controvert the truth of the records in question. For the most part they confined themselves to the claim of insufficiency of the evidence adduced by the plaintiff, and made no effort to show that in fact Tredwell had falsified the records to conceal his crime. The

custom house records, as well as the bills of lading of the plaintiff, showed the total amounts of nitrate in each cargo. The railroad records showed the disposition of the cargo in each ship. If the cars purchased by the defendants did not come from the plaintiff's ships, it would not have been a difficult matter for the defendants to show the discrepancies between the railroad records of the disposition of the nitrate and the bills of lading and custom house records showing the amount of the various cargoes. The defendants did not examine or produce the records of other importers from which it is contended the nitrate might have been stolen.

A vice president of the plaintiff company testified that the loss of the nitrate was discovered by a comparison of the import records of the company with the records of the railroad, showing the shipment of the cars. The defendants severely criticized the plaintiff for failing to produce in court these import records, but made no effort before or during the trial to compel the production of the plaintiff's books and records. It is also noteworthy that the railroad records were proved by the defendants themselves to be correct in those matters of which the defendants had particular knowledge, namely, the receipt of the goods, for in each instance the destination and contents of the cars, as shown by the railroad records, tallied with the shipments received and paid for by the defendants.

In two instances the defendants point to facts which they urge tend to impair the force of the records in question. Officers of the Caraleigh Phosphate & Fertilizer Works, one of the defendants, testified to their experience as dealers in fertilizer materials, and showed that the bags of nitrate received by them weighed 95 pounds each, whereas the weight of bags of imported nitrate invariably weighed 195 to 210 pounds each. In any case, this circumstance would have little significance, and in this instance it has no force whatever, since the chief, if not the only, theory of the defense is that the goods may have been imported at Norfolk by some one other than the plaintiff.

The Eastern Cotton Oil Company, another defendant, proved that it arranged to purchase two cars of nitrate through De Jarnette as early as November 2, 1917, and actually paid for them on November 8, 1917; that the cars in question, according to the railroad company's records, were loaded from the Steamship Texan, which was not entered at the custom house at Norfolk until November 8, 1917. It is argued that the railroad records must be in error as to the origin of the material because the vessel could not have been discharged until after the sale. It is clear, however, that the dishonest agent, who was then in the midst of his dishonest dealings, could easily have known of the impending arrival of the Texan's cargo as early as November 2, and could have made arrangements in advance to dispose of a part of the cargo when discharged. As a matter of fact, the evidence shows that the unloading of the vessels began as soon as they were entered, and that the Texan was completely discharged on November 13, 1917.

[1] The conclusion of this court, after a careful consideration of the evidence, is that the ownership by the plaintiff of the goods appropriated by the defendants was clearly established beyond reasonable

question or doubt by the records which have been discussed. But the defendants also contend that the records were inadmissible under the rules of evidence, and this question remains to be considered.

[2] The records were produced in court by E. W. Bishop, the chief export clerk of the railroad at Lambert's Point, in whose office and under whose supervision they were made and kept. The import and coastwise record was kept in a book which showed the names of the vessels which came into Lambert's Point in 1916, 1917, and 1918, and the portions of the cargoes loaded into cars shipped over the railroad, and the destination of the cars. By the entries in this book the nitrate was traced from the ships into the cars delivered to the defendants. Original shipping orders from Tredwell, reconsignment records of cars stopped in transit and reconsigned, and seal records showing when cars were loaded and sealed, were also produced. A few of the entries were made by Bishop, but most of them were made by clerks under his supervision. Bishop was able to identify the handwriting of some but not all of the clerks. Some of them were no longer in the employ of the railroad company, and their whereabouts were unknown. Others, who had left the railroad company's employ, were known by Bishop to be alive, and had been seen by him not long before the trial, but no effort was made to locate them and produce them as witnesses.

At one time during the unloading of the vessels in this case the railroad company was working 24 hours per day, employing a day and a night force. The manner of handling the cargoes was as follows: Tredwell had under him squads of men or stevedores engaged in the unloading of the vessels and the loading of the cars. As the nitrate came from the hatch, it was weighed, placed on trucks, and loaded into the car. The weigher made a record on a pad and turned it in to Tredwell's office on the pier, where the shipping orders were made by his employees and delivered to the railroad office. After a car was filled, one of Bishop's clerks would inspect and seal it. Tredwell's report of the contents was accepted without verification. The shipping orders or instructions consisted of car numbers, contents, and destination of the cars. Receipts provided by Tredwell were signed by the railroad clerks, one copy being given to Tredwell for each car, and a duplicate thereof kept in the railroad office. From these shipping orders and duplicate receipts, the coastwise and import record in the book was made. The records thus made were of the same character as other records of freight from Lambert's Point carried over the Norfolk & Western had been made for the preceding 20 years. They were designated by the railroad as official records, and were used by it for tracing shipments.

It is well settled, in the case of a written record, that it should be proved by the entrant, who must testify that he had personal knowledge of the facts recorded. Under such circumstances, it may be used to refresh the recollection of the witness by occasional reference, or, if the witness has no personal recollection, it may be used or read as a memorandum of his past recollection, provided he is able to identify it, and to testify that when made it was correct. If the record represents the composite result of the work of several persons, as where

it is made by one person, who has no knowledge of the facts transcribed, but bases the entry upon the report of others who have such knowledge, the general rule is that all of the persons concerned in the entry should be produced as witnesses.

It often happens, however, that one or more of the parties concerned in the making of a record is unavailable as a witness, and cannot be produced for cross-examination. The admissibility of the record in such case depends on whether or not under the circumstances it comes within one of the recognized exceptions to the hearsay rule. Prof. Wigmore states that the principles underlying the exceptions to the hearsay rule, which justify the omission of the test of cross-examination are two: (1) Necessity; and (2) a circumstancial guarantee of the trustworthiness of the evidence which in effect makes cross-examination unnecessary. Wigmore on Evidence, § 1420. In accordance with these principles, which have been widely adopted by the courts, records made in the regular course of business are usually admissible when the entrant is necessarily absent by reason of death or absence from the jurisdiction. The principle of necessity is plainly present, and the trustworthiness of the record is guaranteed, when supported by the testimony of some person who can prove its identity and correctness, and its preparation and use, under circumstances which furnish substantial proof of its correctness.

In recent years the conditions, of necessity, justifying the use of a record without the supporting testimony of the entrant have been extended beyond the circumstances of death and absence from the jurisdiction. The courts have recognized other cases of unavailability as sufficient. This is particularly true of records of modern industrial activities in which the facts are complex and the persons concerned so numerous that no one of them has an accurate recollection of the whole chain of events, or, indeed, ever had a complete knowledge of it. The record itself in these cases is in effect the best and only evidence of the transaction. If it is identified, and its correctness and regularity are established, there is no sound reason why it should not be accepted as proof of great value. In the case at bar the regularity is fully proved. The records were made contemporaneously with the facts, by persons employed for the purpose by the railroad company in the regular course of business, as part of a system habitually employed, in order that the railroad might have an accurate account to which reference might thereafter be made in the conduct of its affairs. The identity and correctness of the record is proved by the supervising agent and clerk who was charged with the duty to cause the record to be made, and to preserve it for future reference and use. It would not be practical or of value to produce the other participants in the transaction. Indeed, the defendants do not contend that the men who moved the material should be produced. The admissibility of the record is attacked on the ground that the subordinate clerks, who made the final entries in the railroad office, were not called as witnesses or proved to be unavailable. But the clerks themselves could give no testimony based upon personal recollection. They could not testify that they had knowledge of the facts when they made the entries, but could merely say

that they correctly transcribed the memoranda reported to them.  In such case—

"it should be sufficient if the books are verified on the stand by the supervising officer who knew them to be the books of regular entries kept in that establishment; thus the production on the stand of a regiment of bookkeepers, salesmen, shipping clerks, teamsters, foremen or other subordinate employees, should be dispensed with." Wigmore on Evidence, § 1530; Chamberlayne on Evidence, §§ 2881, 2884, 2886, and 2887.

It is not intended to impeach the general rule that records should be proved by persons who made them, with knowledge of the facts recorded.  It must be left to the discretion of the trial court to determine, in the circumstances of each case, whether it is necessary to dispense with witnesses having personal knowledge, and whether, in their absence, there is sufficient evidence of the accuracy and regularity of the entries to justify their admissibility without compliance with the general rule.  When there is no reason to suspect the accuracy of the entries, and there is present such circumstantial guaranty of trustworthiness as is found in this case, the records should be received with the same confidence in the courtroom as in the business world.

The observation of Mr. Justice Story, in Nicholls v. Webb, 8 Wheat. 331, 5 L. Ed. 628, is noteworthy:

"The rules of evidence are of great importance, and cannot be departed from, without endangering private a well· as public rights.  Courts of law are, therefore, extremely cautious in the introduction of any new doctrines of evidence, which trench upon old and established principles.  Still, however, it is obvious, that as the rules of evidence are founded upon general interest and convenience, they must, from time to time, admit of modifications, to adapt them to the actual condition and business of men, or they would work manifest injustice."

The extent to which the conclusions reached have been adopted by the federal courts is shown by the following decisions in civil and criminal cases in federal circuits: Grunberg v. U. S., 145 Fed. 81, 76 C. C. A. 51 (First Circuit); Heike v. U. S., 192 Fed. 83, 112 C. C. A. 615, and The Spica (C. C. A.) 289 Fed. 436 (Second Circuit); Rutan v. Johnson, 231 Fed. 369, 145 C. C. A. 363, and Reyburn v. Queen City Savings Bank, 171 Fed. 609, 96 C. C. A. 373 (Third Circuit); Greene and Gaynor v. U. S., 154 Fed. 401, 85 C. C. A. 251 (Fifth Circuit); Wisconsin Steel Co. v. Maryland Steel Co., 203 Fed. 403, 121 C. C. A. 507 (Seventh Circuit); Mississippi Logging Co. v. Robson, 69 Fed. 773, 16 C. C. A. 400, and Crowell v. Panhandle (C. C. A.) 271 Fed. 129 (Eighth Circuit).  See, also, Northern Pacific Ry. Co. v. Keyes (C. C.) 91 Fed. 47; U. S. v. Venable Construction Co. (C. C.) 124 Fed. 267.

The same principles have been adopted in substance in many of the state courts of the country, as is shown by the cases in the footnote,[1]

- [1] St. Louis, etc., R. v. Sutton, 169 Ala. 389, 55 South. 989, Ann. Cas. 1912B, 366; Shirley v. Southern Ry. Co., 198 Ala. 102 73 South. 430; People v. Walker, 15 Cal. App. 400, 114 Pac. 1009; Bush v. Taylor, 136 Ark. 554, 207 S. W. 226; Montgomery v. Ocean Park Scenic Ry. Co., 32 Cal. App. 32, 161 Pac. 1171; Cooke v. People, 231 Ill. 9, 82 N. E. 863; Louisville & N. Ry. Co. v. Daniel, 122 Ky. 256, 91 S. W. 691, 3 L. R. A. (N. S.) 1190; Givens v. Pierson's Administratrix, 167 Ky. 574, 181 S. W. 324, Ann. Cas. 1917C, 956; Madunkeunk D. & I. Co. v. Allen, 102 Me. 257, 66 Atl. 537; Schwall v. Higgins-

in most of which the entrant was not produced, or proved to be unavailable by reason of death or absence from the jurisdiction.

[3] The appellee further contends that, whatever may be the general rule of evidence applicable to cases of this kind, the case should be governed by the law of evidence obtaining in the state courts of North Carolina, and that under the decisions of the Supreme Court of that state the documentary evidence was inadmissible. The contention is that under the Conformity Act (R. S. § 914; Compiled Statutes, § 1537), the Rules of Decision Act (R. S. § 721; Compiled Statutes, § 1538), and the Competency of Witnesses Act (R. S. § 858; Compiled Statutes, § 1464), not only the state statutes, relating to the competency of witnesses and the competency of testimony, but also the state law of evidence, generally is made binding on the federal courts sitting within such state, except where in conflict with the federal Constitution, statutes, or treaties.

It cannot be said that this rule is well settled by the decisions of the federal courts. It has been decided, notwithstanding the federal statutes above cited, that the decisions of state courts relating to general commercial law, or to the law of negligence, are not laws within the meaning of R. S. § 721 (Swift v. Tyson, 16 Pet. 1, 10 L. Ed. 865; B. & O. v. Baugh, 149 U. S. 368, 13 Sup. Ct. 914, 37 L. Ed. 772), and to the same effect with reference to the law of evidence (Chicago & Northwestern R. Co. v. Kendall, 167 Fed. 62, 93 C. C. A. 422, 16 Ann. Cas. 560). On the other hand, there are decisions of the federal courts which hold, without extended discussion, that the law of evidence of the several states, within the meaning of section 721, R. S., applies not not only to statutes, but to decisions of their highest courts. Nashua Savings Bank v. Anglo-American Co., 189 U. S. 221, 23 Sup. Ct. 517, 47 L. Ed. 782; A. A. Co. v. Hogan, 213 Fed. 416, 130 C. C. A. 52: Myers v. Moore (C. C. A.) 279 Fed. 233, 25 A. L. R. 1.

The principle underlying the distinction between the respect to be given by federal courts to state decisions on commercial law and the law of negligence, on the one hand, and the law of evidence, on the other, has not been clearly enunciated. It is not necessary, however, to decide this question for the purpose of this case, because, in our

ville Milling Co., 195 Mo. App. 89, 190 S. W. 959; Cudahy Packing Co. v. Chicago & Northwestern Ry. Co. (Mo. App.) 201 S. W. 596; Smith v. Sullivan, 58 Mont. 77, 190 Pac. 288; Nye v. Chicago & N. Ry. Co., 105 Neb. 151, 179 N. W. 503; Roberts v. Claremont Power Co., 78 N. H. 491, 102 Atl. 537; Leonard v. State, 100 Ohio, 456, 127 N. E. 464; Radtke v. Taylor, 105 Or. 559, 210 Pac. 863, 27 A. L. R. 1423; Wells Whip Co. v. Tanners M. F. Ins. Co., 209 Pa. 488, 58 Atl. 894; Wm. Zoller Co. v. Hartford Ins. Co., 272 Pa. 386, 116 Atl. 359; Lowenstein v. Greenbaum, 65 Pa. Super. Ct. 19; Burke Elec. Co. v. P. L. & P. Co., 61 Pa. Super. Ct. 374; J. L. Mott Iron Works v. Kaiser (S. C.) 103 S. E. 783 (see First Nat. Bank v. J. L. Mott Iron Works, 258 U. S. 240, 42 Sup. Ct. 286, 66 L. Ed. 593); Continental Nat. Bank v. First Nat. Bank, 108 Tenn. 374, 68 S. W. 497.; Pelican Lumber Co. v. Johnson, 44 Tex. Civ. App. 6, 98 S. W. 207; Commercial Nat. Bank v. Heid (Tex. Civ. App.) 226 S. W. 806; French v. Virginian Railway Co., 121 Va. 383, 93 S. E. 585; F. Dohmen Co. v. Niagara Fire Ins. Co., 96 Wis. 38, 71 N. W. 69; West Virginia v. Stewart, 68 W. Va. 506, 70 S. E. 113, 36 L. R. A. (N. S.) 899; Farmers' Nat. Bank v. Pratt, 193 Iowa, 406, 186 N. W. 924.

opinion, the decisions of the Supreme Court of the state of North Carolina are not at variance with the conclusions hereinbefore reached. The leading case in that state on this point is Firemen's Insurance Co. v. Seaboard Air Line, 138 N. C. 52, 50 S. E. 452, 107 Am. St. Rep. 517. In that case, which was brought to charge the railroad company with responsibility for damage from fire, train sheets of the railroad company, showing the time when trains passed a given point, were admitted in evidence, upon the testimony of the train dispatcher who had made the entries based upon reports sent in by telegraph operators, without producing the operators as witnesses. The dispatcher had no knowledge of the facts contained in the report. The decision by Judge Connor is in accord with the principles which we have endeavored to lay down, and is widely cited as an admirable discussion of the modern rule.

In a later case, Jones v. Atlantic Coast Line. 148 N. C. 449, 62 S. E. 521, suit was brought for damages to a carload of horses. The railroad, in order to prove the condition of the stock, offered in evidence the original record of a conductor handling the shipment between two points. The evidence was rejected because the conductor who made the record was not produced. There was no attempt on the part of the court to overrule the prior decision in 138 N. C., and it is manifest that the circumstances of the case did not present such conditions of practical unavailability of the entrant as prevail in the case at bar. The same may be said of the decisions in Mercer v. Lumber Co., 173 N. C. 52, 91 S. E. 588; Lumber Co. v. Lumber Co., 176 N. C. 504, 97 S. E. 483.

The proof adduced on the part of the plaintiff established its ownership of the goods, and, the railroad record upon which it depended being admissible in evidence, the judgment in each case is reversed.