## NEWTON v. TRACY LOAN & TRUST CO.

No. 5397.   Decided January 10, 1935.   (40 P. [2d] 204.)

548

*Cheney, Jensen & Marr* and *Walter C. Hurd,* all of Salt Lake City, for appellant.

*L. B. Wight,* of Salt Lake City, for respondent.

MOFFAT, Justice.

This is a suit in equity. The plaintiff alleged in his original complaint a partnership between himself and one J. P. Megeath, now deceased, and sought an accounting. The complaint also contained a count for the recovery of money had and received or moneys advanced by plaintiff to or for the use of Megeath. Several changes were made in the plead-

ings by amendments until in the final form, as nearly as the subject-matter may be classified, the claim of the plaintiff is for the recovery of a balance alleged to be owing upon a mutual or open and running account.

From the pleadings it appears that Joseph P. Megeath died on November 3, 1929, leaving property in the state of Utah; that the defendant, Tracy Loan & Trust Company, was on November 22, 1929, appointed executor of the last will and testament of Megeath; that from about 1913 until the death of Megeath, plaintiff and Megeath had engaged in various business enterprises; that Megeath became indebted to the plaintiff for money advanced and money collected and retained, or withdrawn from the various business enterprises in which they were engaged, and designated as an open mutual and running account, upon which there was a balance due to the plaintiff, the sum of $12,506.92 with interest; that after the death of Megeath and within time, plaintiff duly presented his duly verified proof of claim in writing against the estate of deceased; and that the claim was rejected.

The defendant, as executor, answered and counterclaimed, admitting appointment as executor, presentation of claim, and refusal to allow or pay the claim, and alleged affirmatively that the moneys claimed to have been paid or disbursed by the plaintiff were paid or disbursed in connection with several separate and distinct business enterprises, enumerating them as: (a) Expenditures in connection with the construction of three houses; (b) the purchase or transaction relating to a 20 horse power motor; (c) in the matter of a "Montana Oil Venture"; (d) a matter designated as "Cummings Candy Company" venture; and (e) in connection with a matter entitled "Re Lyn. Holding Co."

The defendant maintains that the various matters in which the plaintiff and Megeath were interested were separate and distinct transactions; that any claim that plaintiff may have is barred by the statute of limitations.

The defendant also claimed an indebtedness due to deceased upon three promissory notes, one for $1,000 dated August 2, 1928, signed by plaintiff and by Franklin Motor Car Company, a second note for $7775.23, dated August 30, 1928, signed by plaintiff, and a third note for $4,600, dated March 1, 1929, signed by plaintiff and by the Franklin Motor Car Company; the first and second payable direct to Megeath and the third payable to the Continental National Bank of Salt Lake City and indorsed by Megeath, which because of plaintiff's failure Megeath had been required to pay. The defendant further alleged that between May, 1923, and February, 1927, Megeath had advanced and paid to or on behalf of plaintiff various sums of money upon an open account, and that there was due and owing from plaintiff on such account to defendant the sum of $2,116.50, making an apparent total of $8,491.73.

By reply plaintiff denied that the moneys paid by plaintiff or that withdrawn by Megeath were paid and disbursed as distinct and separate transactions; and alleged affirmatively that such advances, payments, and transactions were all part of a joint business between Megeath and plaintiff; that from 1913 to 1929 the account was an open, current, and mutual account; that the balance changed from time to time and may have been in favor of one at one time and the other at another; but was never fixed or determined as to just what the reciprocal demands or liabilities were.

It was alleged that the house transaction extended over the period from 1913 until October 22, 1925; that the motor transaction occurred about 1923 and had never been adjusted; that the Montana Oil venture extended over the time from June, 1923, to February, 1927; that the connection with the Cummings Candy Company extended from January, 1924, until December 6, 1926; and the Lynndyl Holding Company operations were from January, 1924, to May 10, 1927; and that all of those transactions went into a mutual, open, and running account.

The plaintiff admitted the execution and delivery of the three notes and claimed that they had all been paid by crediting Megeath with the full amount thereof upon the account, and denied there was anything due to the defendant on the counterclaim. From the issues as thus made up, the case was tried. The trial resulted in a judgment in favor of the plaintiff. The defendant has appealed.

The assignments of error are numerous and involved; the argument is lengthy, detailed, and more or less complicated. The burden of the argument of appellant goes to the question of credibility of witnesses and weight to be given to the evidence submitted to and received by the trial court.

The court found the corporate existence of appellant; the death of Joseph P. Megeath; the appointment of the appellant as executor of the last will and testament of the deceased. The trial court in substance, further found that between the 17th day of October, 1913, and the 3d day of November, 1929, Joseph P. Megeath and C. W. Newton, plaintiff and respondent, engaged in various business enterprises such as acquiring, developing, and selling oil lands and stock, acquiring, building on, and improving real estate, acquiring, operating, and owning interest in the manufacture of candy, acquiring and operating farm lands, and in the sale and disposition of such property; that in the dealings in and relating to such property and business it was by said parties mutually agreed that each should own one-half and would pay one-half the expense of operation and the purchase price when acquired; that such business, dealing, and relationship, as well as loaning money one to the other, continued until the death of Joseph P. Megeath; that said deceased became indebted to plaintiff for moneys advanced and for the use and benefit of Joseph P. Megeath in excess of the moneys advanced by said Megeath "upon an open, mutual and running account" during the whole of said term; that after the death of Joseph P. Megeath on or about March 3, 1930, plaintiff within proper time presented his claim to the executor,

in writing as required by law; that said claim was rejected by the executor of said estate, defendant herein.

The findings then make reference to the verified claim, and said claim is made a part of the findings, and after finding that certain items have not been proved, the trial court also finds and makes deductions therefrom and determines the balance due and owing to the plaintiff, and renders judgment for such sum.

The court further found negatively that the relations and transactions were not separate and distinct transactions as alleged by the defendant, but constituted a joint business, concerning which there had never been determined a balance, and that no part of the claim found by the court was barred by the statute of limitations pleaded by defendant. The court further found that the notes executed by the Franklin Motor Car Company and Charles W. Newton had all been paid by plaintiff Newton and credited upon the account presented by him.

As heretofore indicated, appellant herein has assigned errors. In appellant's argument the assigned errors are grouped under designated headings and argued accordingly. It is urged:

(a) That the court erred in admitting in evidence certain exhibits designated as Exhibits 131 to 135, inclusive, and each of them, and further erred in refusing to strike them upon defendant's motion. This is admitted to be an action in equity, though partaking in a measure of the old form of assumpsit.

There is, as revealed by the pleadings and evidence, a thread of trust relationship running through the course of dealing between Newton, the plaintiff, and Megeath, the deceased, from the beginning of their business in 1913 till the death of Megeath. Suits on claims of this character proceed upon the equitable principles that underline an action for money had and received. Cases of this type are less restricted by technical rules than any other form of action. The trial court looks beyond the form and

to the fundamental right and justice of the cause. *United States* v. *Jefferson Electric Mfg. Co.*, 291 U. S. 386, 54 S. Ct. 443, 78 L. Ed. 859.

Except as corroborated by checks and the testimony of N. W. Clayton concerning matters that appear also in the Exhibits 131 to 135, inclusive, and incidental references and a general course of dealing covering a long period of time and furnishing a background of what occurred, those exhibits depend upon the testimony of Mrs. Newton. She testified that she was the wife of plaintiff and kept the books of the Franklin Motor Car Company; that in those books there was an account kept of the transactions between Mr. Megeath and Mr. Newton. That Mr. Megeath visited at her house a good deal; that he had the books set up, part of them being in his own handwriting; that she kept the books from information furnished her by Mr. Megeath and Mr. Newton; that Mr. Megeath always had access to the books and examined them; that at times she had personal knowledge of the transactions recorded; that the entries or records were not always made contemporaneously with the transactions. The entries in the exhibits (131 to 135) were on leaves carried in the loose-leaf ledger of the Franklin Motor Car Company, but related to the various transactions between Newton and Megeath. Some of the entries had been made in another book or from memoranda that had been destroyed and from checks, memoranda and statements; that when Mr. Megeath went over the book containing these accounts he agreed that the entries were correct, but said: "We will go over them again." This occurred as late as March, 1929. Numerous checks, statements, and other memoranda were received in evidence. Oral testimony, some directly, some more or less remotely, connected with the items set up in the exhibits, was received. Upon cross-examination Mrs. Newton receded from the stated conclusion that Mr. Megeath "agreed that the entries were correct, and adhered to the position that Megeath had access to the accounts and knew of them and made no objection as to them."

Referring to the Cummings Candy Company venture, Mr. Clyde Cummings testified that Mr. Megeath and Mr. Newton talked to him about going into the candy business. Mr. Megeath was present and they offered to guarantee him $100 a month until the business was on a paying basis, then he was to receive 50 per cent. and they were to receive the other 50 per cent. Later Cummings bought the interest of Newton and Megeath by giving a note which was subsequently paid.

N. W. Clayton testified in relation to the First avenue property and the three houses built by Newton and sold. It appears Megeath owned the land subject to a mortgage. Megeath deeded the land to Newton subject to the mortgage, and the latter then mortgaged the property which was divided into three lots, built three houses on the lots, and sold them. One of them was sold to Mr. Clayton. The original mortgage was paid, and the parties purchasing the lots and houses assumed the respective mortgages and made all payments to Megeath. After payment was made in full, deeds were then made to the parties by plaintiff Newton and his wife.

Evidence relating to the items and doings of the parties was given as to each of the other ventures forming the subject-matter of this controversy, not necessary to be detailed here. Suffice it to say that disinterested witnesses indicated conversations with Megeath to the effect he was interested in each of the business ventures hereinbefore referred to.

The whole record discloses, not the usual arm's length business transactions, but transactions based upon intimate and friendly relations, without the usual and systematic record keeping of the transactions in which Megeath and Newton were interested, and that they were jointly interested in all the transactions is established beyond controversy. Megeath usually acted as treasurer, and either collected the money or received it after it was collected, with the exception of the Candy Company venture and the motor transaction. About the only record kept of the transactions was

that kept by Mrs. Newton of the Franklin Motor Car Company, a corporation owned and operated by Newton and of which Megeath was a director. Such records as were kept or memoranda as were made of the transactions, Megeath had access to and assisted in making and examined or could have done so at any time.

That the Exhibits 131 to 135, inclusive, were not books of original entry or books of original account, as usually understood, to bring them within the rule of original entry, is not open to question. No such status is claimed for them. The record, however, does disclose that Mrs. Newton was familiar either directly or by advice or report from Mr. Megeath as to the items of these various accounts. Being familiar with them, having furnished much of the information upon which they were based, the items having been proved by other evidence, places the exhibits upon a different basis than an ordinary ex parte secondary record. The trial court, being in a position to see and hear the witnesses and to weigh and interpret the testimony as the case developed, was in a position to determine what probative value was lodged in this record. As was said in the case of *Du Pont de Nemours & Co.* v. *Tomlinson* (C. C. A.) 296 F. 634, 641:

"It must be left to the discretion of the trial court to determine, in the circumstances of each case, whether it is necessary to dispense with witnesses having personal knowledge, and whether, in their absence, there is sufficient evidence of the accuracy and regularity of the entries to justify their admissibility without compliance with the general rule. When there is no reason to suspect the accuracy of the entries, and there is present such circumstantial guaranty of trustworthiness as is found in this case, the records should be received."

Methods of bookkeeping have so changed, transactions are of such character, and business operations so differently set up, that it is seldom that the original memorandum of the transaction or a part of it ever reaches the book of record of the transactions by the hand or with the knowledge of the party who participated in or made the original memorandum

of the transaction. Wigmore on Evid. (2d Ed.) § 1548, says:

"The fact that the book is kept in ledger form, with each person's account separate, or in day book form with the items in the actual order of the transactions, is immaterial; though it may perhaps lessen the credit to be given to the book. But a ledger book may be open to the independent objection that it is not the original book, and may on this ground be excluded."

Originally books of account of original entry made as the transactions took place and by the party having actual knowledge of the transactions were admitted as an exception to the hearsay rule. Finally the exception became a rule. The book of original entry, such as a daybook, based on consecutive transactions and such appearing, they were thought to be made under such circumstances, and by persons who were presumed to have first-hand knowledge of the transaction, that such books were presumed to import a verity sufficient to justify admitting them in evidence though purely on ex parte record, and made out of the presence of the other party to the transaction.

In an Alabama case the parties were shown to be tenants in common. One of the parties was in management of the common property. The system of bookkeeping was peculiar. The book in question was one made up from entries in other books. Annual statements had been made up therefrom and such statements had been accepted without objection for a long series of years. The books were open and accessible to the parties. On two occasions the book in question had been inspected by an agent of the opposing party, and no objection had been made to it. It was held that the book should have been admitted in evidence. *McGrath et al.* v. *Stein et al.*, 148 Ala. 370, 42 So. 454.

Wigmore, discussing the production of the original book at section 1558 (2d Ed.), says:

"The general rule requiring the production of the original of a writing, here as elsewhere, must be satisfied; i. e. the entry offered

must be the original; if the original cannot be had, as determined by the ordinary rules, a copy may be used.

"It therefore becomes necessary to distinguish between the different processes and the different classes of books employed in bookkeeping, in order to determine whether the one offered is or is not the first and original book of regular entries. A ledger though otherwise not objectionable will usually not be the first book entered up; nevertheless, if the first book be in fact in ledger form, it will none the less be admissible. Furthermore, the record admissible is one consisting of a regular series; hence, the first regular and collected record is the original one, and it is immaterial that it was made up from casual or scattered memoranda preceding it. The application of the principle must depend much on the circumstances of the particular case.

"Since the book is merely a statement about the transaction, and is not the transaction itself, the parol evidence rule does not apply, and therefore the transaction, as such, can be proved orally *without producing or accounting for the book.*"

In view of the circumstances, the separate proof, documentary and oral, of the transactions which the court accepted as proved, and the further fact that a few of the items in exhibits were not allowed, indicate that the court ■ did not accept the exhibits as controlling upon all. matters in any event. We think it was within the discretion of the trial court under the circumstances to receive the ledger sheet accounts in evidence.

"Where a cause is tried to a court without a jury, the mere fact that incompetent evidence is admitted does not require reversal, if there is sufficient competent evidence to support the finding respecting a material issue." *Western Securities Co.* v. *Spiro*, 62 Utah 623, 221 P. 856; *Spratt* v. *Paulson*, 49 Utah 9, 161 P. 1120.

(b) Appellant further urges:

"The five accounts shown upon exhibits 131 to 135, inclusive, do not constitute one mutual, open, running account."

The position taken by this division of the argument of appellant and the assignments argued thereunder are untenable. This matter was made an issue by the pleadings and

the court found the issue for the plaintiff. It appears clear from the record that no matter what the nature of the account as referred to in the exhibits or the manner or method of keeping it, the transactions of which the account or accounts purport to be a record constituted one continuous course of dealing without a settlement or determination of their respective debits and credits, or a balancing of their respective claims or liabilities from the inception of the building transactions in 1913 until the death of Mr. Megeath. Whether or not the dealings or transactions between plaintiff and the deceased constituted a continuing open and running series of transactions does not depend for proof upon the Exhibits 131 to 135, the ledger sheets in question. What has been said in more detail in relation to assignments under the first subdivision herein is sufficiently applicable hereto to indicate appellant's position to be untenable. We think there is sufficient competent and material evidence in the record to support the trial court's finding that the transactions and relations of the parties constituted a continuous unsettled course of dealing. The transactions manifest mutual trust and confidence, and a continuing fiduciary relationship.

(c) Grouping other assignments, appellant urges:

"The plaintiff is not entitled to recover payments shown to have been made by the Franklin Motor Car Company."

Appellant cites two Utah cases and a number from other jurisdictions relating to circumstances when a court may entirely disregard a corporate entity in order to reach the real parties in interest or to prevent fraud. We cannot see how such principle is involved in this case. No such issue is raised directly or indirectly by the pleadings. No finding is made thereon. It is true that in defendant's counterclaim certain notes were set up, alleged to have been signed by the Franklin Motor Car Company and plaintiff. The court found that the notes had been paid either by the Franklin Motor Car Company or by the plaintiff, and in so

far as either the defendant or Megeath are concerned, which one made the payment is of no consequence. The same may be said as to checks issued by or upon the account of the Franklin Motor Car Company and paid for the use and benefit of the Lynndyl farm account. Because the check was issued to or made payable to the party to whom Newton and Megeath were indebted rather than to Newton or Megeath, so long as the fund reached the creditor in due course, should not cause a denial of proper credit to the party making the payment. The same result would have been reached in the matter by changing the name of the payee and proper endorsement, all of which appears to have been within the power of the maker of the checks. Where a party has received a fund for a given purpose, it does not lie with the party thus benefited to claim an intervention of a corporate entity for the purpose of defeating a just claim. The evidence shows without dispute that plaintiff was the owner of all the stock of the Franklin Motor Car Company, except a few shares issued to others probably for qualifying purposes; Mr. Megeath being one and a director. A check drawn on the company account, with Edward Jenkins as payee, received by him and credited by him upon the Lynndyl farm purchase in which Newton and Megeath were jointly interested, presents such a situation calling upon a court to look through the form and to the substance of the transaction and protect the real parties in interest. *Western Securities Co.* v. *Spiro,* supra.

It is also urged that:

"The claim of plaintiff is inherently incredible; it is negatived by the testimony of the plaintiff himself."

The trial court found no such inherent incredibility. Considering the testimony of the witnesses and the unusual methods employed by Mr. Megeath in his business ventures, his failure to keep books of account himself and his setting up and directing and aiding in the keeping of the books kept by Mrs. Newton, the witnesses, in so

far as one may judge from the record, manifested a candor in and grasp of a difficult situation. The court without question believed the testimony of Mrs. Newton and that of the other witnesses on behalf of plaintiff, and being in a better position to observe the manner of testifying, personal bearing, attitudes, interest, bias, animus or want of it, ability to see, know, and observe the intelligence of witnesses and to judge and determine the credibility of a witness and the weight to be given to the testimony, than is this court, from a review of the record, and a finding supported by material competent evidence should not be disturbed unless there is revealed by the record itself something intrinsically erroneous or incompatible with the truth inherent in the situation. We cannot say that any such situation is revealed in this case. While there are circumstantial variations, and admitted errors of statement, there are not more than would normally be expected in a situation covering a period so long and involving so many details and complications.

(e) Appellant seems to urge that the plaintiff recovered and sought to recover upon a claim different than the claim presented to the executor of the estate. The point is stated:

"The rights of the plaintiff are limited by the claim filed in the estate of Megeath."

After the evidence was all submitted, plaintiff asked leave and was permitted by the court to file an amended complaint; also plaintiff was permitted to make some amendments by interlineation, over defendant's objection. Appellant claims the second amended complaint varied the cause of action originally pleaded and introduced new causes of action.

Whether the transactions and relations between the parties be denominated a partnership, a mutual open and running account, or a balance due for money had and received in a series of unsettled transactions extending over a period of years, the items and claims involved are the same. The original claim filed with the executor was

the basis upon which the trial court determined the amount the plaintiff was entitled to recover. From the original claim certain items were stricken in toto, others disallowed in part. No new or additional claim not originally claimed was introduced, set up, or allowed. The amended complaint was not inconsistent with the original complaint. It is true one may not recover on a different ground or a different theory from that stated in the complaint. No different grounds for holding defendant responsible were alleged. It is equally true that "power of a court to permit an amendment of a pleading does not authorize an importation which in effect introduces a new or different cause of action." *Combined Metals, Inc., et al.* v. *Bastian et al.*, 71 Utah 535, 267 P. 1020, 1027, and cases cited.

"Under proper conditions pleadings may, however, be amended as well after as before the evidence is received," and the "court may permit the pleadings to be amended to conform to the evidence and make findings and enter judgment accordingly." *Rosenthyne* v. *Matthews-McCulloch Co. et al.*, 51 Utah 38, 168 P. 957, 961.

In the case of *Casady* v. *Casady et al.*, 31 Utah 394, 88 P. 32, 33, the following situation is presented:

"During the course of the trial the plaintiff was given leave to amend his complaint by inserting, 'comes now the plaintiff and for an amendment to his complaint says that the services so rendered by the plaintiff for defendants were reasonably worth fifty per cent of the amount received by the defendants, to-wit, fifty per cent of $9,800.' The defendants objected to the allowance of the amendment on the ground that the amendment stated an additional and different cause of action than that alleged in the complaint, for that, the cause of action as stated in the complaint was upon an express contract, while the amendment stated a cause of action upon a quantum meruit, and that the complaint with the amendment stated two causes of action not separately alleged, and that, therefore, the court was without authority to allow the amendment. When thereafter witnesses on behalf of the plaintiff were interrogated as to the value of the services rendered by the plaintiff, the defendants objected thereto upon the same grounds, and, for the same reasons, requested the court to grant a nonsuit and to direct a verdict, claiming that the original complaint was upon an express contract of which there was

no evidence in support, and that the court was without authority to allow the amendment permitting the plaintiff to recover on a quantum meruit. We think no error was committed in the rulings."

Defendant's chief objections to the filing of the amended complaint and the amendments by interlineation were that "by claiming and alleging that the accounts sued upon constituted one open mutual and running account during the whole term," plaintiff was permitted to change his claim for moneys advanced to one on a mutual open ■ running account. This was an issue raised by the filing of defendant's answer and counter-claim. When defendant set up and claimed the matters set out in the claim filed were separate transactions and therefore barred by the statute, an issue of fact was presented thereby. The trial court found that the transactions constituted a mutual and open running account, made findings accordingly, which findings conform to the proof. The record does not disclose that the defendant was prejudiced by the amendments. It was within the power and discretion of the court under the circumstances to permit the amendments and filing of an amended complaint.

(f) Appellant contends that:

"The evidence does not support the finding that the plaintiff and Megeath were equally interested as owners in and obligated each to pay one-half of the expenses of the various transactions."

The court found with respect to the Montana oil deal, the Cummings Candy Company business, the building, and sale of the First avenue houses, and the Lynn- ■ dyl Holding Company land deal that:

"It was by said parties mutually agreed that each should own one-half and would pay one-half the expense of operation and of purchase price when acquired."

As to the first avenue propery, Mr. N. W. Clayton in substance testified that he recalled the construction of the three houses on First avenue in Salt Lake City; that he was

now living in one of them; that in a conversation with Mr. Megeath in the fall of 1913, Mr. Megeath had tried to induce Clayton to build upon the lots; that Megeath had told Clayton that if Clayton "would finance a building on that property, he would turn over the property and would go in on a fifty-fifty basis." Mr. Clayton further testified that he told Mr. Megeath that:

"Mr Newton is a builder. If you can get hold of him, he will probably go in on the deal. So he had me make an arrangement to meet Mr. Newton. And we three met. And the deal was made in my presence, whereby Megeath put in his one hundred fifteen feet, and Mr. Newton was to build the houses."

E. E. Jenkins testified relating to the Lynndyl property that:

"Along in 1924 or 1925 * * * Mr. Megeath and Mr. Newton came into the office and they took up and paid one of those notes of twenty-two hundred dollars. Megeath paid the note himself in cash, and he said to me, he says, 'Jenkins if you will take Abraham's water notes I will pay you the whole thing, pay it all.' * * * And he says, 'You know I am interested in this with Charlie (Mr. Newton).' "

The deed to the Lynndyl property had been taken in Mr. Newton's name. It was payments made on this property by Newton with Franklin Motor Car Company checks, previously discussed herein, that Mr. Newton claimed and was given credit for by the trial court.

In relation to the Cummings Candy Company deal, Mr. Clyde Cummings testified that Mr. Megeath and Mr. Newton came and talked with him about the candy business.

"So, I told them, however, I would give them a definite answer after Christmas. And we did so well with the Christmas candy from the house that I told them I would take a chance with them. * * * They offered to guarantee me one hundred dollars a month until the business was on a paying basis, then I was to receive fifty per cent and they were to receive fifty per cent between them. They were to finance me with the cash necessary, and also stand back of my credit with the various people from whom I was purchasing my raw materials."

"Q. Just state what was said with reference to their interest, their half interest? A. Well, the way it was put up to me, I was to receive fifty per cent, and they were to receive the other fifty per cent, the two of them.

"Q. Who said that? A. Both of them."

Relative to the Montana oil deal, Mr. W. R. Livingston testified that he remembered having a talk with Mr. Megeath and Mr. Newton about their relative interests in the Montana deal when they were both present:

"Q. What was said with reference to their interests? * * *

"Q. Was Mr. Megeath present? A. Yes sir. Well on numerous occasions it was when we made our apportionments, it was just that each one should have half.

"Q. What? A. Each should go to fifty-fifty on that venture."

And after a disposition of the interest in the Montana oil venture, and referring to a conference between Mr. Newton and Mr. Megeath at which Mr. N. W. Clayton was present, at which time the discussion had reference to some notes received in payment on that deal, Mr. N. W. Clayton testified that Mr. Megeath said that they received the notes as payments on the Montana deal, and he had received them and held them as his own paper, and that when the discussion came up Mr. Clayton said to Mr. Megeath:

"Well, Mr. Megeath, if you take this paper and you have taken the notes in payment of this Montana deal, you will either have to give Mr. Newton a half of the notes or give him the money; he is entitled to half of it."

The foregoing testimony does not purport to be all of the testimony, but represents the trend thereof.

The evidence supports the finding of the court as to the proportionate interests of Newton and Megeath in the business ventures entered in by them.

"The fact that two persons share the profits of a business raises the presumption that they are partners. [Citing cases.] * * * As to the terms of the partnership, if any, the law seems to be well

settled that, in the absence of any agreement or proof of an agreement to the contrary, the partners will divide the profits and the losses equally." (Citing cases.) *Kimball* v. *McCornick et al.*, 70 Utah 189, 259 P. 313, 316.

There are other assignments of error made and argued. All of them present questions relating to the testimony of witnesses, the weight that should be given, the burden of proof, the sufficiency of the findings to support the judgment, and kindred matters that are sufficiently covered by what has been said heretofore in this opinion. It would unnecessarily add to the length of this opinion and serve no purpose to discuss the matters involved further. The relationship of the questions and the subordinate character of them are such that they are controlled by the results reached in disposing of the problems thus far discussed.

There is, however, one matter raised by appellant's last point argued, relating to the proposition urged that, "The judgment is not such as was within the power of the lower court to render." In support of this it is maintained that the lower court entered a personal judgment against the defendant and that under the law the court did not have the power to enter such judgment against the defendant, but merely a judgment that the claim filed by plaintiff, to the extent that such claim was found by the lower court to be a valid claim, be allowed and paid in the regular course of probate.

The judgment as rendered by the court is to the effect that the plaintiff "have judgment against the defendant, the Tracy Loan & Trust Company, a corporation *as executor of the last will and testament of Joseph P. Megeath, deceased,*" in the sum specified with interest. At the time of passing upon the motion for new trial, the lower court reduced the judgment by a specified amount to which the plaintiff agreed. In a general sense the judgment rendered by the court is a personal judgment, but as to a judgment against the Tracy Loan & Trust Company in its individual or personal capacity as distinguished

from its capacity "as executor of the last will and testament of Joseph P. Megeath, deceased," clearly the judgment runs against the company in its official and not in its personal capacity. Manifestly, the court would have no power to render a judgment against the Tracy Loan & Trust Company as such in an action where such company was sued and defended only in its official capacity as an executor.

In the cases of *Clayton* v. *Dinwoodey*, 33 Utah 251, 93 P. 723, 14 Ann. Cas. 926, and *Smith* v. *Hanson*, 34 Utah 171, 96 P. 1087, 18 L. R. A. (N. S.) 520, cited by appellant, reference to the abstracts reveals that the judgments in those cases decreed that "said plaintiff have and recover from said defendant" sums specified.

Under the provisions of 102-9-15, R. S. Utah 1933, a judgment rendered against an executor or administrator upon a claim for money against the estate represented by such executor or administrator establishes the claim in the same manner as if it had been regularly allowed. The statute then further provides that "the judgment must be that the executor or administrator pay in due course of administration the amount ascertained to be due." Further proceedings are then specifically provided for the collection and payment of the claim. The judgment herein is a judgment against the executor in its official capacity only and could be paid only as provided by the statute. As was said by the court in the case of *United States Fidelity & Guaranty Co.* v. *Bletcher*, 64 Utah 49, 228 P. 188, after quoting section 7659, Comp. Laws Utah 1917, now 102-9-15, R. S. Utah 1933, supra:

"The statute thus, in specific terms, determines the legal effect of the judgment against an estate, and it further determines that the allowance of a claim is in legal effect precisely the same as a judgment; namely, that in either case the only fact that is established is the amount of the claim and that it must be paid in due course of administration. And, in order to prevent all complications, the statute further provides that no execution can be issued on the judgment, that it creates no lien upon any property, and that the judgment does not give a preference to any creditor."

The judgment as rendered can be given no effect other than or different from that provided by the statute. It will do no harm and will prevent any question or argument about the matter if the statutory words as above indicated are added to the judgment.

The court, or the parties upon application to the court, may amend or have the judgment amended accordingly. The judgment of the court below as amended upon motion for new trial is affirmed. Respondent to recover costs.

STRAUP, C. J., and ELIAS HANSEN, J., concur.

FOLLAND and EPHRAIM HANSON, JJ., dissent.