Argued September 21; reversed October 24; rehearing denied
November 28, 1933

# PACIFIC TRADING CO. *v.* SUN INSURANCE OFFICE, Ltd.

(25 P. (2d) 1052)

*G. C. Fulton,* of Astoria (G. C. & A. C. Fulton, of Astoria, on the brief), for appellant.

*J. C. Veazie,* of Portland (Veazie & Veazie, of Portland, on the brief), for respondent.

CAMPBELL, J. Plaintiff seeks to recover alleged unearned insurance premiums which it claims were paid on two insurance policies issued on February 17, 1929, covering certain property of the Sanborn-Cutting Company which policies were cancelled by the insurer April 20, 1929. There is no dispute as to the amounts, the date of issue or cancellation of the policies.

Plaintiff alleges that the premiums on the policies were paid in full. Defendant claims that no part of the premiums were paid, and counterclaims for the part of the premiums which it claims were earned before the policies were cancelled.

The cause was tried to a jury, resulting in a verdict and judgment in favor of defendant for the amount of its counterclaim. Plaintiff appeals.

At a former trial of this cause, the circuit court entered a judgment of non-suit and on appeal to this court the said judgment was reversed and the cause remanded. *Pacific Trading Company v. Sun Insurance Office,* 140 Or. 314 (13 P. (2d) 616). Appellant now contends that the law, as laid down in that opinion, became the law of the case. However, all that had been decided on that appeal was the questions that were therein presented, and that there was competent evidence to establish a prima facie cause of action on behalf of plaintiff.

For many years the partnership, doing business under the name of George W. Sanborn and Sons and which will hereafter be referred to as the partnership,

was the general agent of the defendant, an insurance corporation, with power to issue its policies of insurance on blanks provided by the insurer, and collect and account for the premiums. It was the custom of the partnership to account for the premiums and remit the insurer's portion thereof every sixty days. The partnership engaged in other lines of business besides insurance, including brokerage.

The Sanborn-Cutting Company, a corporation, was in the business of salmon packing with its cannery at Astoria, Oregon. A large part of its product was sold through the partnership as its brokers.

On February 17, 1929, the insurer, through its agent the partnership, issued its two policies of insurance to the Sanborn-Cutting Company on which the premiums in dispute herein arose.

Upon the cancellation of the policies on April 20, 1929, by the insurer, demand was made on it for the unearned premiums. Defendant refused payment thereof, claiming it had never been paid any part of the premiums.

On May 10, 1929, plaintiff purchased the entire assets of the Sanborn-Cutting Company including the claim on which this action is founded.

In the course of the trial plaintiff introduced testimony tending to show that for many years the partnership as brokers for Sanborn-Cutting Company handled many thousands of dollars worth of cannery products. As insurance agents of defendant the partnership issued thousands of dollars of the insurer's policies of insurance on the goods and property of the Sanborn-Cutting Company. The method of writing and carrying this insurance was about as follows: The insurer furnished its agents with blank insurance pol-

icies with its printed signature thereon and containing the following provision: "This policy shall not be valid until countersigned by the duly authorized agent at ——." There is no dispute but that the partnership had the right to issue the policies in question herein. All the policies theretofore issued by the defendant to the Sanborn-Cutting Company were issued by and through the said partnership and all the books of account and all the details of the transactions relative to the insurance policies of defendant were kept in the partnership books.

As brokers, when the partnership made a sale of the cannery products it would ship the goods to the buyer and then attach a sight draft on the buyer for the purchase price, to the shipping receipt or bill of lading and deposit it, in its own name, in a local bank as cash, immediately subject to check. Thereafter the funds thus received were distributed on its books by the partnership. It would deduct its brokerage, advances and sufficient to pay the premiums on the insurance policies and credit the Sanborn-Cutting Company with the balance. This method extended over a period of ten years and possibly longer. The record does not disclose that the funds were always placed in a separate deposit, but does show the segregation on the books of the partnership as introduced in evidence.

A summary of the partnership books in evidence indicates a sale of products of the insured on February 13, 1929, amounting to $5,328. It also indicates a balance in favor of the insured on February 17, 1929, of an amount sufficient to more than pay all premiums of insurance.

On that date, on its books, the partnership gave itself credit for the amount of the premiums in ques-

tion as well as some other premiums, and segregated on its books these sums from the money that should have been due the Sanborn-Cutting Company and also segregated on its books the money it was to account for to the insurer on these premiums from the part that it had earned as a commission for writing the policies.

Every sixty days, the partnership would account to the insurer for the premiums on all policies that had been issued and remit what was found due.

1. Plaintiff assigns as error the giving of the following instruction by the court:

"All moneys shown by the evidence in this case to have been received by Geo. W. Sanborn & Sons for the Sanborn-Cutting Company are shown to have been so received as proceeds of salmon and other goods sold by Geo. W. Sanborn & Sons as brokers or agents of the Sanborn-Cutting Company. Geo. W. Sanborn & Sons therefore received and held said moneys in the first instance as agents or brokers for the Sanborn-Cutting Company, and can not be deemed to have held it any time as agents for defendant, unless by some acts performed after the original receipt of such money and while such money or enough thereof to pay the premiums owing to this defendant by the Sanborn-Cutting Company remained in their hands, Geo. W. Sanborn & Sons set aside, designated or appropriated as a fund for payment of said premiums, a part of said moneys sufficient for said purpose. That is to say, defendant was not paid unless at the time of alleged payment Geo. W. Sanborn & Sons actually had in their hands available for such payment sufficient funds of the Sanborn-Cutting Company, and performed some act whereby they ceased to hold the money for the Sanborn-Cutting Company and assumed custody and control of it as agents for defendant."

The real controversy herein is, when did the money arising from the sale of the products of the insured

become the property of the insurer? If this money came into the hands of the partnership solely as the property of the insured then it would be necessary for the partnership to do something in the way of segregating it from the funds of the insured. If, however, the money was unconditionally placed in the hands of the partnership for the purpose of taking care of these insurance premiums, then it was not incumbent on the part of the insured to see that the agent "set aside, designated or appropriated it as a fund for the payment of the premium". Assuming that the money was unconditionally placed in the hands of the partnership for the purpose of paying the premiums in question, it would then make no difference when it was so placed nor whether the partnership had it on hand at the time the policies were issued.

It is true that without authority from the insurer the agent, the partnership, had no right to accept canned salmon or other personal property in satisfaction of the premiums (*Hoffman v. John Hancock Insurance Co.*, 92 U. S. 161 (23 L. Ed. 539)) but when the agent had converted the salmon into cash, with authority from the insured to apply it on the payments of the premiums, then the money was received by the partnership in its capacity as agent of the insurer. We can see no difference between such a transaction than if the insured in the first instance placed the cash in the hands of the insurer's agent for the purpose of payment of the premiums. The insured's responsibility would cease when it unconditionally gave the insurer's agent the money for the premiums. Upon the record, in the instant case, it was not the province of the court to instruct the jury that the partnership in the first instance came into

possession of the money it held, as the receipts of the sale of the insured's property, as agents of the insured, nor to instruct that defendant was not paid unless its agent had the money on hand at the time of the alleged payment. These were questions to be submitted to the jury for its determination under proper instructions, taking into consideration all the facts and circumstances of the case. The capacity in which the partnership came into the possession of and held the said money was a fact to be proved as any other fact in the case. It might have been shown that the money was held by the partnership as agent for the insurer by reason of a direct order from the insured. Or it might be established by showing certain relations or conduct of the parties from which the jury might draw such an inference, or by showing a custom in the transaction of such business between the several parties from which the jury might infer that when the partnership made a sale of the products of the insured, it received, as agent of the insurer, a part of the receipts therefrom to provide for the insurance needs of the insured arising in the near future.

2 and 3. These assignments of error are based on instructions given on the same theory as the instruction covered by assignment of error No. 1, and the same reasoning is applicable thereto.

4. This assignment of error is predicated on the court propounding certain questions, over the objection by counsel for plaintiff.

These questions were asked on the same theory that the above instructions were given. While O. J. Bumala, the bookkeeper who kept the books of the partnership and made the entries therein concerning the premiums under consideration in this case, was testifying about

certain entries that appeared in the books of the partnership, the court of its own motion asked the witness:

"Q. Is there anything on that sheet that indicates that at the time the policies were returned or any time thereafter, there was any payment made for the policies?

A. Particularly for the policies?

Q. For these policies.

A. Nothing else, is that the idea?

Q. Yes.

A. No this doesn't show anything like that."

These questions and answers were of no particular value in explaining these entries in the books. Immediately thereafter on re-direct examination the witness was asked by counsel for plaintiff, referring to the same entries:

"Q. Then tell me how it doesn't show payment?"

The court sustained an objection to this question. Counsel for plaintiff offered the proof that the question was intended to elicit, to wit: That if the witness were permitted to answer, he would testify that his intention and meaning when he wrote that in was that the premium was paid by cash previously advanced.

Not all judges and few jurors are expert accountants and there can be no objection to permitting the one who made the entries in the book to explain their meaning and why and how they were made. While "figures don't lie", yet they are capable of being misunderstood. As a usual thing in any case, when litigants are represented at the trial by able counsel, as they were in this case, it is advisable for the trial judge to follow the precepts enunciated in *Edwards v. Mt. Hood Construction Company,* 64 Or. 308 (130 P. 49).

5. This assignment is predicated on the refusal of the court to permit J. D. Snell, a witness on behalf

of plaintiff, a public accountant and who was book-keeper for the Sanborn-Cutting Company at the time of the transaction involved in the instant case, to answer the following questions in reference to the account-books kept by him for the Sanborn-Cutting Company:

"Q. What does it show, what application, if any, was made of the charges of the money that were collected on account of the sale of salmon?

"Q. What do the books show was done with that money?"

The court sustained objections to both of these questions and counsel for plaintiff offered to prove that if the witness were permitted to answer the first question he would testify that the records, from which he was testifying, the summary, that the money, this cash that the partnership had received from the sale of salmon was applied in payment of the premium on the insurance policies in question and if he were permitted to answer the second question, that he would testify from his summary and from the books themselves, it is shown that five thousand-odd dollars which the partnership had received for the sale of salmon on account of the Sanborn-Cutting Company was applied on the payment or discharge or satisfaction of the two premiums in the case.

The witness, having qualified as an expert accountant and as the one having made the entries referred to, should have been allowed to explain to the jurors what transaction the entries were intended to represent and how and why they were made.

■ Entries in account books made in the regular course of business and at or near the time of the transaction, while not conclusive, are admissible in evidence

when the transaction they purport to reflect is in controversy. *Radtke v. Taylor,* 105 Or. 559 (210 P. 863, 27 A. L. R. 1423).

For these reasons, the judgment of the lower court will be reversed and the cause remanded with instruction to grant a new trial.

It is so ordered.

RAND, C. J., KELLY and BAILEY, JJ., concur.